ANDRESINI, J.T.C.
This is the court’s opinion after trial in the above-referenced matter challenging the assessment on plaintiffs property for the 2009 tax year. For the reasons set forth in this opinion, the assessment will be reduced.

I. Procedural History and Findings of Fact

Venture 17, LLC (“plaintiff’) is the owner of a multi-tenant office building located in Hasbrouck Heights (“defendant”). The property is designated by Hasbrouck Heights as Block 127.02, Lot 1 (“subject property”). For tax year 2009 the subject property was assessed as follows:
*114 Land:_$1,611,300
Improvements: $2,903,600
Total: $4,514,900
The Director’s (chapter 123) ratio for Hasbrouek Heights was 96.26% for tax year 2009.
Plaintiff filed a timely direct appeal with the Tax Court contesting the local property assessment on the subject property for tax year 2009. The defendant counterclaimed that the assessment was less than true value, and accordingly demanded judgment to increase the assessment.
The subject property is a 1.815 acre lot improved with a 30,025 square foot five-story office building. The building is of average quality masonry construction, and both appraisers agreed the subject was in good condition as of October 1, 2008. The office building contains two elevators and two stairwells to access offices on upper levels. The exterior of the building has adequate parking accounting for approximately 120 spots. There is HVAC heating and roof mounted cooling units.
The parties made the following stipulations, which the court accepts: The cost approach was inapplicable. For purposes of the income approach, total expenses were $230,155. There is a time adjustment of negative 5% per year for comparable sales and leases prior to October 1,2008.
Both parties presented appraisal reports and offered testimony from experts. They stipulated to their respective qualifications, which this court accepts. Both experts concluded that the highest and best use of the subject property was its continued use as an office building. This use conforms to permitted uses in the B-2 Highway Commercial Zone where the property is located. In the opinion of the taxpayer’s expert, the subject property had a true market value of $2,157,000 for 2009. Defendant’s expert opined the property’s true market value was $4,900,000 for 2009.
*115 At trial, plaintiff also offered the testimony of two witnesses to support the claim that the sale of the subject property on August 20, 2009 was an arms length transaction and corroborates his income approach.
A. Plaintiffs Expert’s Approach to Valuation
Both litigants acknowledged the income approach to valuation is the predominant method of valuation for income producing properties. The taxpayer’s expert’s report focused on the income approach. However, at trial he testified to giving weight to the sales comparison approach due to the proximity of the August 2009 post-assessment sale and parity between the sales price and his income approach analysis.

Sales Comparison Approach

The subject property was sold for $2,150,000 in August of 2009, and taxpayer’s expert testified that the sale is indicative of the true market value. The seller of the subject property was the plaintiff, Venture 17, LLC and the purchaser was Somerset Growth Partners, LP. The expert spoke with the seller and concluded it was an arm’s length sale at market terms. After hearing testimony from the buyer and broker at trial, the expert’s opinion was unchanged.
The members of plaintiff limited liability corporation were four individuals who also managed the property under the business name SBWE. At all times relevant to the valuation date of October 1, 2008 and thereafter, SBWE was a tenant in the subject property building, occupying the entire fifth floor.
Plaintiffs first witness was a Ms. Kathleen Beaver, a licensed real estate broker and former employee of SBWE. She testified that she was involved in the leasing of the space in the building at one point, managing the building, and later, in the marketing of the building for sale. Ms. Beaver testified that since the four partners were either retiring or were getting older, they informally decided on or about 2006 to possibly sell the subject property. She further testified that the efforts to sell heightened in 2007 when one of the four partners passed away and another was *116 retiring. Ms. Beaver testified that the marketing in or before 2008 was somewhat limited or “semi-confidential” because the partners did not want the existing tenants to become aware of the potential sale. By the valuation date of October 1, 2008, however, the subject was being marketed fully and even placed on the CoStar[1] database. Ms. Beaver continued to explain that one of the big considerations for the purchase of the subject property was SBWE occupying the whole fifth floor, or approximately twenty percent of the building.
SBWE first received an offer from the ultimate purchaser of the subject property in or about April 2009. Ms. Beaver conveyed that offer, in writing, and discussed it with the partners of SBWE. The contract for sale of the subject was executed in July 2009. Section 11.5 of the contract provides that the purchaser, Somerset Growth Partners, LP allow SBWE to remain at the subject property, continuing to occupy the entire fifth floor at a negotiated rent rate. As executed, the purchase price for the sale of the subject was $2,150,000.
Plaintiff also called the purchaser of the subject property, Mr. John Metzger, an executive in the financial services business. Mr. Metzger testified that his first offer for the property was $2,550,000, which assumed SBWE would remain a tenant at market rent. He further testified that negotiations went through several stages, and that the sales price was ultimately accepted by both parties as $2,150,000, since SBWE was only remaining on a month-to-month basis. Finally, Mr. Metzger testified that he had no previous dealings with the seller.
Plaintiffs expert appraiser did not provide any information regarding the sale of the property or a sales comparison approach in his report. However, at trial, he testified that the post- *117 assessment date sale of the subject corroborated his income approach value.

Income Approach

Plaintiff’s expert used seven comparable leases, payable on a gross basis, from office space in Bergen County. The adjusted market rents ranged from $16.58 to $28.17 per square foot, and the expert concluded the subject property had a market rent of $18.50 per square foot for a potential gross income of $555,463 as of October 1,2008.
Three comparable leases are from the subject property for a term of three years signed near the valuation date. The appraisal report notes placing greater weight on the subject leases. During trial, the expert opined the previous owners efficiently managed the property, and the subject’s leases were priced to achieve maximum rent in the marketplace. Upon inspection of the building and the leases, the appraiser only made time adjustments to leases from the subject property. The specific time adjusted rents were: lease number one, $19.20 per square foot; lease number three, $16.58 per square foot; lease number six, $20.34 per square foot.
The appraiser utilized four additional leases from Bergen County from two buildings he previously appraised and inspected. Comparable lease number two and lease number four came from a two-story office building in Paramus. Lease number two was signed in May 2008 for a five-year term, and the expert made a negative 2% time adjustment. He made a positive 1% time adjustment to lease number four, which was signed in January 2009 for a three-year term. For both leases, the expert made a positive 10% adjustment to account for inferior location and a positive 10% adjustment due to inferior condition. After adjustments, lease number two was $18.82 per square foot, and lease number four was $25.12 per square foot.
Comparable leases numbers five and seven are from a two-story mixed-use office building with additional office space on the basement level in Teaneck. Lease number five was signed in May 2009, and the expert made a positive 3% time adjustment. He *118 also adjusted lease number seven, dated June 2009, by positive 3% for time. Both leases were for a term of one year. The expert further made a positive 15% adjustment to account for inferior location and a positive 10% adjustment to reflect inferior condition. After adjustments, lease number five was $28.78 per square foot, and lease number seven was $28.17 per square foot.
Based on the analyses of comparable leases ranging between $16.58 and $28.17, and placing greater weight on the subject leases ranging between $16.58 and $20.34, the plaintiffs expert calculated an $18.50 per square foot value.
Next plaintiffs expert selected a 13% vacancy and collection loss factor. The appraisal report and expert’s testimony discussed Colliers Houston & Co.’s Trend letter for the third quarter of 2008. Colliers’ analysis indicated that vacancy rates for Class A and B properties in the Northern New Jersey office space market rose to 13% from 12.8% in the second quarter. The fourth quarter 2008 report by Colliers indicated a 13.2% vacancy rate for the same market. During trial, the expert discussed examining the rent roll attached to the contract for sale, which indicated the subject’s vacancy rate was 15% at the time of sale, which does not include the 20% the plaintiff was occupying on a month-to-month basis. The appraiser’s report indicates 18% of the subject property’s total leasable area was vacant on the effective date of valuation.
The parties stipulated to deduct operating expenses of $230,155.
The expert employed a capitalization rate of 9.1%. He used the band of investment technique to develop the overall capitalization rate starting with studies from the American Council of Life Insurance Tables for the Fourth Quarter of 2008. The indicated ACLI Table interest rates for office buildings ranged from 6.47% to 8.42%, with loan-to-value ration from 67.0% to 79.2%. For 2009, the taxpayer’s expert assumed a 73% loan-to-value ratio, with a loan amortized over 20 years at a 7.45% interest rate, and a 7.59% equity capitalization rate. The selected rate was also the average equity capitalization rate from the Korpaez Real Estate Investor Survey by Property Type.
*119 Plaintiff’s expert concluded the value of the subject property was $2,282,000 as of October 1st 2008 relying on the income approach and incorporating the stipulations.
B. Defendant’s Expert’s Approach to Valuation
Both litigants acknowledged the income approach to valuation is the predominant method of valuation for income producing properties. The defendant’s expert report utilized both the sales comparison approach and the income approach.

Sales Comparison Approach

Defendant’s expert relied on six sales within Bergen County to determine the subject’s true value as of the valuation date at issue. Comparable sale one is located at 473 Sylvan Avenue in Englewood Cliffs. The property sold on June 28, 2007 for $2,911,000. It is a 13,600 square feet three-story multi-tenant office building built in 1990. The indicated price per square foot was $214.04. The expert made a market adjustment of negative 6.25% to reflect decreases in sales prices over the period of time the sale was made. The adjusted sales price was $2,729,063. He made the following other adjustments: a negative 10% adjustment for building size; a positive 5% adjustment because the property was inferior in condition and quality. The adjusted unit price was $190.64 per square foot after adjustments.
Comparable sale two is located at 200 Engle Street in Englewood. The property sold on July 20, 2007 for $3,250,000. The two-story multi-tenant office building is 17,954 square feet built in 1975, and the indicated price per square foot was $181.02. The expert made a negative 5.83% time adjustment. The adjusted sales price was $3,060,525. He made the following other adjustments: a positive 5% adjustment because of inferior location; a negative 5% adjustment for building size; a positive 5% adjustment because the property was inferior in condition. The adjusted unit price was $178.98 per square foot after adjustments.
Comparable sale three is located at 120 Route 17 in Paramus. The property sold on October 29, 2007 for $8,500,000. The two-story multi-tenant office building is 48,600 square feet built in *120 2000, and the indicated price per square foot was $174.90. The expert made a negative 4.58% time adjustment. The adjusted sales price was $8,110,700. He made the following other adjustments: a positive 5% adjustment for building size. The adjusted unit price was $175.23 per square foot after adjustments.
Comparable sale four is located at 17-15 Maple Avenue in Fair Lawn. The property sold on March 3, 2008 for $1,757,000. The three-story multi-tenant office building is 9,594 square feet built in 2000, and the indicated price per square foot was $183.13. The expert made a negative 7.92% time adjustment. The adjusted sales price was $1,705,695. He made the following other adjustments: a positive 5% adjustment to account for inferior location; and, a negative 10% adjustment for building size. The adjusted unit price was $168.89 per square foot after adjustments.
Comparable sale five is located at 114 Essex Street in Rochelle Park. The property sold on June 22, 2009 for $3,350,000. The three-story multi-tenant office building is 20,496 square feet built in 1971, and the indicated price per square foot was $163.45. The expert made a negative 1.25% time adjustment. The adjusted sales price was $3,308,125. He made the following other adjustments: a positive 5% adjustment to account for inferior location; and a positive 5% adjustment because the property was inferior in condition. The adjusted unit price was $177.54 per square foot after adjustments.
Comparable sale six is located at 106 West Palisade Avenue in Englewood. The property sold on September 2, 2009 for $1,200,000. The two-story multi-tenant office building is 8,200 square feet built in 1975, and the indicated price per square foot was $146.34. The expert made a negative .42% time adjustment. The adjusted sales price was $1,194,960. He made the following other adjustments: a positive 5% adjustment to account for inferi- or location; a negative 10% adjustment for building size; a positive 5% adjustment to account for inferior location; and, a positive 5% adjustment to account for inferior parking. The adjusted unit price was $153.02 per square foot after adjustments.
*121 Based on the analyses of comparable sales ranging between $153.02 and $190.64, the defendant’s expert calculated a $175 per square foot value, and concluded $5,337,500 was the value of the subject property as of October 1, 2008.

Income Approach

Defendant’s expert relied on eight comparable leases, and the ten leases at the subject property, to develop a market rent of $22 per square foot, plus tenant electric and a pro-rata share of any increases in operating expenses as of October 1, 2008. The modified gross leases are from three different buildings located in Bergen County.
Comparable leases numbers one, four and five are from a six-story multi-tenant office building in Hackensack known as “University Plaza.” Comparable lease number one is dated June 2, 2007 for a rental value of $23.25 per square foot plus tenant electric. The expert made a negative 6.67% time adjustment but no other adjustments. This resulted in an adjusted economic rent of $21.70 per square foot. Comparable lease number four was signed August 1, 2008 at a rental value of $23.50 per square foot plus tenant electric over a five-year term. This was also adjusted only for time by negative 0.83%, and resulted in an adjusted economic rent of $23.30 per square foot. Comparable lease number five was signed December 1, 2008 at a rental value of $23.00 per square foot plus tenant electric for a three-year term. This was also adjusted only for time by negative 4.17%, and resulted in an adjusted economic rent of $22.04 per square foot.
Comparable lease number two, dated July 17, 2007, is from a building that is part of a three building office complex known as “Continental Plaza,” and also located in Hackensack. The average rental value over an eight-year term was $28.50 per square foot plus tenant electric. To this comparable, the defendant’s expert again made only a time adjustment. The negative 6.04% time adjustment resulted in an adjusted rental value of $26.78 per square foot.
Comparable lease number three is dated March 1, 2008 from a multi-tenant office building in River Edge. The average rental *122 value was $20.18 per square foot over the three-year term plus tenant electric. The expert made a time adjustment of negative 2.92% and a positive 5% adjustment to account for an inferior location. This resulted in a positive 2.08% net adjustment and an adjusted economic rent of $20.60 per square foot.
Comparable lease number six is dated April 16, 2009 from a multi-tenant office complex in Saddle Brook. The rental value was $22.00 per square foot plus tenant electric for a term of five and a half years. The expert made only a time adjustment of negative 2.29% resulting in an adjusted economic rent of $21.50 per square foot.
Comparable leases numbers seven and eight are from a multitenant office building in Teaneek. Comparable lease number seven is dated May 1, 2009 for $22.35 per square foot on a gross basis for one year. The expert made a time adjustment of negative 2.08%, a positive 5% adjustment to account for an inferior location, and a positive 5% adjustment to account for inferior location. This resulted in a positive 7.92% net adjustment and an adjusted economic rent of $24.12 per square foot. Comparable lease number eight is dated May 1, 2009 for $21.88 per square foot on a gross basis for one year. The expert made the same adjustments to comparable lease eight as he did to comparable lease seven. The resulting adjusted economic rent for comparable lease eight is $23.53.
Based on the analysis of comparable leases ranging between $20.60 and $26.78, and weighing the leases at the subject property, the defendant’s expert calculated $22.00 per square foot was market rent for the property as of October 1, 2008.
The expert used a 7.5% allowance for vacancy and collection loss. During the trial he testified coming to the figure based upon his experiences in the market and from properties similar to the subject within the subject market. The defendant’s appraisal report similarly offers that the figure was selected based on the location and general vacancy levels for properties of the same type in the subject’s market.
Again, the parties stipulated to total expenses of $230,155.
*123 The defendant’s expert developed an overall capitalization rate of 7.71% using the band of investment technique, which rounded up to 8%. The appraiser’s report includes data from Korpacz and the ACLI Investment tables from the Third Quarter of 2008. The expert assumed a 65% loan to value ratio, mortgage interest rate of 6.5% and a 25-year mortgage term. His equity rate was 7%.
Defendant’s expert concluded the value of the subject property was $4,507,000 as of October 1, 2009 relying on the income approach and stipulations.
The defendant’s expert stated his reliance on both the sales comparison and income approaches in his report and during the trial. He reconciled his two valuations to conclude a fair market value of $4,900,000 for the 2009 tax year.

II. Conclusions of Law

A. Presumption of Correctness

The court’s analysis begins with the well-established principle that “[ojriginal assessments and judgments of county boards of taxation are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
[Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985)).]
The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra., 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J.Tax 439 (Tax 1981)); Township of Byram v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988). The presumption remains “in place even if the municipality utilized a flawed valuation methodology, so long *124 as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.” Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988) (citation omitted).
“The presumption of correctness ... stands, until sufficient competent evidence to the contrary is adduced.” Township of Little Egg Harbor v. Bonsangue, 316 N.J.Super. 271, 285-86, 720 A.2d 369 (App.Div.1998) (citations omitted); see also Atlantic City v. Ace Gaming, LLC, 23 N.J.Tax 70, 98 (Tax 2006). “In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the case through the close of all proofs.” MSGW Real Estate Fund, LLC, supra, 18 N.J.Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995)). To overcome the presumption, the evidence “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’ ” West Colonial Enters., LLC v. City of East Orange, 20 N.J.Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.2000), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000)). Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making an *125 independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-704 (App.Div.1996).
The court finds that plaintiff produced sufficient evidence to overcome the presumption of validity attached to the assessment. If taken as true, the opinion of plaintiffs expert and the facts upon which he relied create a debatable question regarding the correctness of the assessment sufficient to allow the court to make an independent determination of the value of plaintiffs property.
Of course, a finding that plaintiff has overcome the presumption of correctness does not equate to a finding that the assessment is erroneous. To the contrary, plaintiffs overcoming the presumption merely permits the court to address the question of what value should be accorded to the subject property. Once the presumption is overcome, the “court must then turn to a consideration of evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence.” Ford Motor Co., supra, 127 N.J. at 312, 604 A.2d 580 (quotations omitted). “[Although there may have been enough evidence to overcome the presumption of correctness at the close of plaintiffs case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case ... to demonstrate that the judgment under review was incorrect.” Id. at 314-15, 604 A.2d 580 (citing Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308).

B. Sale of the Subject Property

“It is well settled that a bona fide sale of property may be indicative of the true value of the property.” Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 282, 491 A.2d 1247 (1985). As a general principle, however, the sale of a subject property “is not dispositive on the issue of value.” Ibid. The fundamental standard for determining the value of real estate for purpose of taxation is its actual market value, and a commonly used test in arriving at market value is the estimated price the *126 property ought to bring in the open market. Ibid. Market value is defined as:
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other pi-edsely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
[Appraisal Institute, The Appraisal of Real Estate, 22 (13th ed.2008).]
The sale of property is a reliable indicator of fair market value if the following criteria are satisfied:
1) buyer and seller are typically motivated and neither is under duress;
2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;
3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;
4) the purchase price is paid in cash or its equivalent; and
5) the purchase price is unaffected by special or creative financing or by other special factors, agreements or considerations.
[Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J.Tax 68, 94 (Tax 1996).]
While the selling price of real property involved in a judicial determination of its assessed value is usually a guiding indication of its true value and will be accepted into evidence, some sales are not accepted, because they are more heavily influenced by business decisions rather than by real estate decisions. AT & T Corp. v. Township of Morris, 19 N.J.Tax 239, 245 (Tax 2000) (citing Harrison Realty Corp. v. Town of Harrison, 16 N.J.Tax 375, 381-382 (1997), aff'd., 17 N.J.Tax 174 (App.Div.1997), certif. denied, 153 N.J. 213, 708 A.2d 64 (1998)). Moreover, sale of property will not indicate or corroborate property tax valuations where the seller had unusual motivation, the mechanics of the sale were not in keeping with market practice, and the timing of the sale was well after the valuation date in question. See American Cyanamid Co. v. Township of Wayne, 17 N.J.Tax 542, 578-580 (1998), aff'd per cwriam o.b., 19 N.J.Tax 46 (App.Div.2000). “It is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value.” Glen Wall Assoc., supra, 99 N.J. at 282, 491 A.2d 1247. See also, Hackensack Water Co. v. *127 Division of Tax Appeals, 2 N.J. 157, 162-63, 65 A.2d 828 (1949) (holding that the determination must be made by “weighing and appraising of all component factors and adventitious circumstances.”). The defendant is free to rebut evidence of a sale price with evidence that the sale was ... not made at arm’s length, was a distress sale, or was a sham. Glen Wall Assoc., supra, 99 N.J. at 282, 491 A.2d 1247.
Here, plaintiff alleges that the sale of the subject property was a bona fide, arm’s length transaction between willing buyer and unrelated seller, neither under any constraint, acting in their best interest, and further, there were no unusual circumstances surrounding the purchase price. Plaintiffs expert, therefore, relied on the sale as corroborating his value determination. On the contrary, defendant alleges that the sale of the subject was not a bona fide sale and that there were outside factual factors which render the price to be unreliable. I reject the use of such sale as indicating or corroborating the value of the subject property for tax assessment purposes for tax year 2009.
The court finds that the seller, although not under duress, was unusually highly motivated to sell the property. See Hull Junction Holding Corp., supra, 16 N.J.Tax at 95. See also Whippany Assocs. v. Township of Hanover, 1 N.J.Tax 325, 330 (Tax 1980) (finding that the seller was under a greater economic compulsion than the hypothetical willing seller). This motivation is evident from the real estate broker’s testimony that one of the partners of the seller corporation had recently passed away and the other members were contemplating retirement.
Furthermore, the lease back to the seller is a special factor that affects the purchase price. A condition of the sale, as evidenced by section 11.5 of the contract for sale, was that the seller was permitted to remain in the building, occupying the entire fifth floor. In addition to occupying approximately 20% of the building, seller was able to obligate itself to pay only $5,000 per month on a month-to-month basis for 6,522 square feet, or $9.23 per square foot. As evidenced by Mr. Metzger’s testimony, the purchaser accepted the provision in the contract for sale since the alternative *128 was to have 20% of the property vacant. Ms. Beaver testified that the other tenants in the building were paying much higher rent than $9.23. This special consideration clearly affected the purchase price.
Finally, the sale of the subject took place in July 2009, and negotiations did not take place until April 2009, more than 6 months after the valuation date at issue. While not too remote in time to our valuation date, it is sufficient time when coupled with the special factors set forth above to reject the sale as corroborative of value on the assessment date herein.
The sale of the subject is, therefore, an unreliable indicator of market value. For all of the above reasons, I conclude that the sale of the subject property is of no assistance, even as corroborative evidence, in determining the value of the property for local property tax assessment purposes. See American Cyanamid Co. v. Township of Wayne, 17 N.J.Tax 542, 578-580 (1998), aff'd per curiab o.b., 19 N.J.Tax 46 (App.Div.2000) (citing Harrison Realty Corp. v. Town of Harrison, 16 N.J.Tax 375, 381-82 (Tax 1997)(finding that the sale of the subject property was not the “best indication of its true value” and noting that “some transactions are more influenced by business decisions than by real estate decisions”)), aff'd, 17 N.J.Tax 174 (App.Div.1997), certif. denied, 153 N.J. 213, 708 A.2d 64 (1998).

C. Valuation

“There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost.” Brown v. Borough of Glen Rock, 19 N.J.Tax 366, 376 (App.Div.)(eiting Appraisal Institute, The Appraisal of Real Estate 81 (11th ed.2006)), certif. denied, 168 N.J. 291, 773 A.2d 1155 (2001). “There is no single determinative approach to the valuation of real property.” 125 Monitor Street LLC v. Jersey City, 21 N.J.Tax 232, 237 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965); ITT *129 Continental Baking Co. v. Township of East Brunswick, 1 N.J.Tax 244 (Tax 1980)), aff'd, 23 N.J.Tax 9 (App.Div.2005). The choice of the predominate approach to determine value is case specific, as it depends “upon the facts of each case and the reaction of the experts to those facts.” Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J.Tax 51, 61 (Tax 1982)).
Both litigants acknowledged the income approach to valuation is the predominant method of valuation for income producing properties. The taxpayer’s expert report solely focused on the income approach. However, at trial he testified to giving weight to the market approach due to the proximity of the August 2009 post-assessment sale and parity between the sales price and his income approach analysis. The defendant’s expert report utilized both the sales comparison approach and the income approach.

a. Sales Comparison Approach

The sales comparison approach is the most common technique for valuing sites, and it is the preferred method when comparable sales are available. Appraisal Institute, The Appraisal of Real Estate, at 363 (13th ed.2008). See Genola VenturesShrewsbury v. Borough of Shrewsbury, 2 N.J.Tax 541, 551 (Tax 1981). This method of valuation has been defined as “the process of deriving a value indication for the subject property by comparing similar properties that have recently sold with the property being appraised, identifying appropriate units of comparison, and making adjustments to the sales price (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison.” The Appraisal of Real Estate at 297. The sales comparison approach is applicable to all types of real property interests when there are sufficient, reliable transactions to indicate value patterns and trends in the market.
The Appraisal of Real Estate sets forth the systematic procedure that appraisers follow to apply the sales comparison approach. Primarily, appraisers conduct research regarding similar properties to the subject property that “have recently sold, are *130 listed for sale, or are under contract.” Id. at 301. Through their research, appraisers consider characteristics of the properties including (1) property type, (2) date of sale; (3) size; (4) physical condition; and (5) land use constraints. Ibid. In conducting their analysis, appraisers must verify the comparable properties. Ibid. Appraisers verify the information about the transaction “by confirming that the data obtained is factually accurate and that the transactions reflect arm’s length market consideration.” Ibid. To properly complete this process, the appraiser must investigate and ultimately elicit additional information about the property. Ibid.
Here, the comparable sales used by defendant’s expert were of properties that contained leases. Defendant’s expert failed to read the leases or verify the information in the leases. Where a sale is subject to lease that the expert is not familiar with, it contributes against suitability of the comparable sale as reflective of fair market value of the subject. Ford Motor Co. v. Township of Edison, 10 N. J.Tax 153, 176 (Tax 1988).
Defendant’s expert failed to investigate what effect, if any, the leases had on the sale of the comparable properties. In other words, defendant’s expert failed to examine the comparable properties “through the eyes of an informed, prudent purchaser.” See Ford Motor Co., 10 N.J.Tax at 175. “An informed and knowledgeable purchaser would not purchase a large industrial facility without an inspection and would confirm the factual data furnished by others and reveal the observable condition, amenities, and finish of the improvements.” Ibid. Indeed, an informed and knowledgeable purchaser would follow similar reasoning for the office building at the subject property, as well.
The court concludes that there is an “absence of sufficient sales data having probative value,” and therefore I must reject the sales comparable approach as developed in this case. See Ford Motor Co., 10 N.J.Tax at 176.

b. Income Capitalization Approach

In the instant matter, both experts also applied the income approach. It is well settled that the valuation of income-producing properties is predominantly determined by using the *131 preferred income capitalization approach. Parkview Vill. Assocs. v. Borough of Collingswood, 62 N.J. 21, 23, 297 A.2d 842 (1972). Under the income approach, “an appraiser analyzes a property’s capacity to generate future benefits and capitalizes the income into an indication of present value.” The Appraisal of Real Estate at 445. The steps involve estimating the property’s gross rental income, which should reflect the market rents, then deducting an allowance for vacancy and collection loss resulting in gross income. Thereafter, operational expenses are deducted resulting in net income which is capitalized to arrive at the property’s value to an investor. Lamm Assocs. v. Borough of West Caldwell, 1 N.J.Tax 373, 377 (Tax 1980). The court determines that the appropriate valuation method is the income approach.

1. Plaintiffs Analysis

A summary of plaintiffs expert’s income approach analysis is as follows: 30,025 square feet @ $18.50 [2]/ sq. ft.
($17 base rent + $1.50 tenant electric) $555,463.00
Less: Vacancy and Credit Loss (10%) (72,210.00)
Effective Gross Income (“EGI”) $483,253.00
Less: Operating Expenses (stipulated) (230,155)
Net Operating Income $253,098
Capitalization Rate = 9.1% + 1.99% $2,282,216.50

Value (rounded) $2,282,000.00

2. Defendant’s Analysis

A summary of defendant’s expert’s income approach analysis is as follows: 30,025 square feet @ $24.50/ sq. ft.
($22 base rent + $1.50 tenant electric +5% operating expense escalation) $735,612.50
Less: Vacancy and Credit Loss (7.5%) (55,170)
Effective Gross Income (“EGI”) $680,442.50
Less: Operating Expenses (stipulated) (230,155)
*132 Net Operating Income $450,287.50
Capitalization Rate = 8% + 1.99% $4,507,282

Value (rounded) $4,507,000

3. Market Rent

“Central to an income analysis is the determination of the economic rent, also known as the ‘market rent’ or ‘true rental value.’ ” Parkway Vill. Apartments Co. v. Township of Cranford, 108 N.J. 266, 270, 528 A.2d 922 (1987). This differs from the actual rental income realized on the property, which may be below market rates. Parkview Vill. Assocs., 62 N.J. at 25-30, 297 A.2d 842. However, actual income is a significant probative factor in the inquiry as to economic income. Id. at 30, 297 A.2d 842. “Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area.” Ibid.
With respect to the determination of market rent, the court finds that both expert witnesses provided comparable rentals requiring significant subjective adjustments, but there is sufficient sampling of comparables from which the court can determine market rent. “The Tax Court should determine value from the evidence submitted, based upon the Tax Court’s knowledge and expertise. The Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question.” Glen Wall Assoc., supra, 99 N.J. at 280, 491 A.2d 1247 (quoting New Cumberland Corp. v. Borough of Roselle, 3 N.J.Tax 345, 353 (Tax 1981)). Therefore, this court is not bound to accept an expert witness’ opinion in toto. An expert’s opinion may be adopted in whole or in part or completely rejected. See County of Middlesex v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979).
The three comparable leases utilized by plaintiffs expert at the subject property are a significant probative factor towards economic rent. The actual or contract rent is not to be ignored. *133 McCrory Stores Corp. v. City of Asbury Park, 89 N.J.Super. 234, 243, 214 A.2d 526 (App.Div.1965). Indeed, it may be that contract rent is a significant factor in the search for economic income. Parkview Village Assocs. v. Borough of Collingswood, supra, 62 N.J. at 30, 297 A.2d 842. The court will make additional adjustments to these leases, however. Plaintiffs expert did not stabilize base rent for leases three and six. Here, agreed upon rental increases in future years incorporated into a lease in a base year need to be stabilized and integrated into the calculation. Leases three and six were each for three year terms, with a .50 cent increase in year two and an additional .50 cent increase in year three. After stabilizing the leases, lease three is for $17.25 per square foot, and lease six is for $20.25 per square foot. Lease one is for $20.00 per square foot. These three leases at the subject property account for tenant and electric charges ranging between $1.50 and $1.75. The court chooses to extract tenant and electric out, and calculate a base rent before adding in additional charges. Therefore, the three comparable sales have a base rent before tenant electric and time adjustments of: $18.50, $16.50, and $18.50, respectively. After adjusting these three leases for time, as accepted by plaintiffs expert, the leases amount to $17.76, $16.34 and $19.06, per square foot, respectively. These rental values are on the lower end with the other comparable leases presented by plaintiffs expert outside of the subject property. The four outside comparables ranged, after adjustments, from $18.82 to $28.78 per square foot.
Defendant’s expert, on the other hand, failed to substantiate most of the data in his report. His lack of knowledge of his own comparable leases was evident at trial. The opinion of an expert depends upon the facts and reasoning which forms the basis of the opinion. Dworman v. Borough of Tinton Falls, 1 N.J.Tax 445, 458 (Tax 1980). Without explanation as to the basis, the opinion of the expert is entitled to little weight. Id. Thus, an expert’s opinion is only as good as the data upon which the expert relied. Greenblatt v. City of Englewood, 26 N.J.Tax 41, 55 (Tax 2010). Here, defendant’s expert’s opinion and comparable leases are given little, if any, weight.
*134 Based on the foregoing, I find $20.00 per square foot to be reasonable for base rent at the subject property for tax year 2009. I will add an additional $1.50 per square foot to each lease to account for tenant electric contributions. Three of plaintiffs expert’s eight comparable leases, and all eight of defendant’s expert’s comparable leases accounted for tenant electric. It is, therefore, evident that the market demands that tenant electric needs to be added to base rent. No additional adjustment for any escalation in operating expenses in future years is necessary, as suggested by defendant’s expert, especially not at a flat rate of 5%.
In conclusion, the court will utilize $20.00 per square foot for base rent, plus $1.50 for tenant electric for a total of $21.50 as market rent for the subject property for tax year 2009.

4. Vacancy & Credit Loss

Plaintiffs expert utilized a 13% vacancy and credit loss based upon Colliers Houston & Co.’s publication in the fourth quarter of 2008. Therein, the vacancy rate for class A and B properties in the six counties that account for the Northern New Jersey Office Market had a vacancy and credit loss of 13% for the third quarter of 2008. On the other hand, defendant’s expert utilized a stabilized vacancy factor of 7.5%, but provided absolutely no additional data in his report or appendix to support this figure.
The Colliers Houston & Co.’s publication utilized by plaintiffs expert is not site specific; rather, it represents a generalized average over six counties in northern New Jersey. Plaintiffs expert provided no testimony or evidence to corroborate the 13% factor pertaining particularly to the Hasbrouck Heights office market. Defendant’s expert failed to provide the “whys and wherefores” to support his stabilized vacancy factor. See Greenblatt v. City of Englewood, 26 N.J.Tax 41 (Tax 2010). I find from all of the evidence adduced at trial that a 10% vacancy rate is reasonable for the subject property for tax year 2009. A vacancy and credit loss rate “must be predicated on an estimate of the long-term quality and durability of the rental income stream.” University Plaza Realty Corp. v. City of Hackensack, 12 N.J.Tax *135 354, 369 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J. 481, 634 A.2d 527 (1993).
Thus, the court will utilize 10% as a reasonable and appropriate vacancy and credit loss rate for the subject property for tax year 2009.

5. Operating Expenses

Operating expenses were stipulated to in the amount of $230,155.

6. Capitalization Rate

The overall capitalization rate is an “income rate for a total real property interest that reflects the relationship between a single year’s net operating income expectancy and the total property price or value.” The Appraisal of Real Estate at 462. The overall capitalization rate is “used to convert net operating income into an indication of overall property value.” Ibid.
Both plaintiffs and defendant’s expert relied on the Band of Investment technique for calculating an overall capitalization rate. “This technique is a form of ‘direct capitalization’ which is used ‘to convert a single year’s income estimate into a value indication.’ The technique includes both a mortgage and an equity component.” Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J.Tax 68, 80-81 (Tax 1996) (quoting Appraisal Institute, The Appraisal of Real Estate at 467 (10th ed. 1992)).
Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
[The Appraisal of Real Estate, supra, at 505.]
In “using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing ‘reliable market data ... to the court as the basis for the expert’s opinion so that the court may evaluate the opinion.’ ” Hull Junction Holding Corp., supra, *136 16 N.J.Tax at 82 (quoting Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 279-80, 491 A.2d 1247 (1985)). “For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance.” Id. at 82-83. Additionally, appraisers may also use data collected and published by Korpaez Real Estate Investor Survey. Id. at 83. “By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers.” Ibid.
The court finds that defendant’s expert presented a reasonable opinion of the appropriate capitalization rate, and therefore the court finds that the rates proposed by defendant’s expert are credible. Defendant’s expert utilized tables by the ACLI for the third quarter of 2008[3] Data was also extracted from Korpaez survey and various economic indicators. Based on the data submitted by the expert, the court finds that the figures propounded by defendant’s expert are well-supported by the record and commensurate with the rate of risk to attract investors.

III. Valuation Summary and Conclusion

The following table summarizes the court’s conclusions, utilizing only the income approach to valuation, discussed above:
Tax Year 2009:
30,025 square feet @ $20.00/sq. ft. $600,500
Plus: $1.50/sq. ft. for tenant electric $45,038
Potential Gross Income 645,538
*137 Less: Vacancy and Credit Loss (13%) (64,554)
Effective Gross Income (“EGI”) $580,984
Less: Operating Expenses (stipulated) (230,155)
Net Operating Income $350,829
Capitalization Rate = 8% + 1.99% $3,511,802

Value (rounded) $3,511,800

Pursuant to N.J.S.A. 54:51A-6a, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as “that range which is plus or minus 15% of the average ratio” for the municipality in which the subject property is located. The formula for determining the subject property’s ratio is:
Assessment divided by True Value = Ratio.
The ratio for the subject property in tax year 2009, therefore, is determined as follows:
4,514,900 divided by $3,511,800 = 1.2856%
The chapter 123 ratio for defendant in tax year 2009 was .9626 with an upper limit of 1.00 and a lower limit of .8179. The ratio for the subject property exceeds the common level range. Pursuant to N.J.S.A. 54:51A-6b, if the average ratio is below the county percentage level (1.00) and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
For tax year 2009, the Tax Court Clerk is directed to enter judgment, in accordance with this opinion, as follows:
Land 1,611,300
Improvements 1,769,200
Total 3,380,500

 CoStar provides information and analytic services for commercial real estate customers and brokers. "Founded in 1987, CoStar conducts expansive, ongoing research to produce and maintain the largest and most comprehensive database of commercial real estate information. [The] suite of online services enables clients to analyze, interpret and gain unmatched insight on commercial property values, market conditions and current availabilities." See http://www.costar. com/about/.

 Plaintiffs expert calculated market rent to include tenant electric charges. Base rent, according to plaintiffs expert's calculations, amounts to $17.00/sq. ft.

 Plaintiff’s expert utilized the fourth quarter data from the American Council of Life Insurers' tables for the relevant years, as opposed to Defendant’s expert who utilized third quarter data from the same tables. ACLI data for each quarter is accumulated as each loan is committed, but submitted at the end of each month. The three months comprising a particular quarter are then compiled together on the final day of the quarter (i.e. September 30th for the third quarter). The most recent data as of the valuation date of October 1 of any given year is, therefore, that of the third quarter. The court finds the Defendant’s expert’s use of the ACLI tables for the third quarter to be more reliable than Plaintiff's expert’s use of the fourth quarter tables.