PER CURIAM.
Plaintiff, 125 Monitor Street, LLC, appeals the February 20, 2004 judgment memorializing the January 15, 2004 decision of the Tax Court that affirmed the local property tax assessment made by defendant, Jersey City (City), for the 2000 tax year for property designated as Lot A in Block 2094 and located at 125 Monitor Street in Jersey City. We are satisfied that the record sets forth substantial credible evidence to support the Tax Court’s findings. Accordingly, we affirm.
Hudson United Bank (HUBCO) was the owner of a multi-story industrial facility of approximately 116,000 square feet of building area at the 125 Monitor Street location.[1] The property is slightly irregular-shaped. It includes 2.18 acres of land and covers a city block. It has frontage on three streets: Johnston Avenue, Pine Street and Monitor Street. The property conforms to some of the zoning requirements such as minimum lot size, width, and depth as set forth in the zoning ordinance. However, the industrial use is not a permitted use under the zoning ordinance. The improvements violate several zoning requirements including lot coverage and yard setbacks. As a result, the use of the property is nonconforming.
HUBCO acquired the property through a merger with another bank, Washington Savings Bank, in June 1994. Washington Savings Bank had originally acquired the property through a foreclosure. When HUBCO acquired the property, it realized that the property was environmentally contaminated. In January 1998, HUBCO filed a Declaration of Environmental Restriction (DER) for a portion of the property restricting residential use. The restriction was identified as 32,000 square feet of parking lot. HUBCO agreed to be “subject to the regulatory and statutory requirements applicable to those who seek to remediate property to a nonresident standard.” The DER required that the affected *12 area be restricted to non-residential use and that it be covered with an impermeable cap.
On May 4,1999, plaintiff and HUBCO entered into a contract of sale for the property for the purchase price of $760,000. Plaintiff was a bank customer of HUBCO. The sale closed on March 15, 2000, five and one-half months after the assessment date of October 1,1999 for the 2000 tax year'.
Defendant’s tax assessment of the subject property for the 2000 tax year was:
Land: $ 365,900
$ 788,600
Total: $1,154,500
At trial, both sides presented witnesses. John Ciña, a senior vice-president for HUBCO, testified for plaintiff. He explained the efforts made by HUBCO in dealing with the environmental problems on the property. He testified that the purchase price of $760,000 “was the highest possible price” that HUBCO could have received based on his efforts to sell the property. He also indicated that he was not under any compulsion to “dump” the property.
William Stack, plaintiffs appraisal expert, also testified that the sale of the property was the best indication of its market value. He stated that the parties were sophisticated and knowledgeable of the “deal.” He also testified that industrial brokers and everyone in the general area knew that the property was for sale.
Defendant relied on Paul Beisser, a professional real estate appraiser, to provide an opinion that supported the value of the property contained in the assessment. The Tax Court, in its opinion, found that the sale of the subject property was not a bona fide arms-length sale and affirmed defendant’s assessment. 125 Monitor Street, LLC v. Jersey City, 21 N.J.Tax 232, 244 (Tax 2004).
Plaintiff sets forth the following issues for our consideration:

POINT i

*13 WAS THE TAX COURT CORRECT IN DETERMINING THAT THE SALE OF THE SUBJECT PROPERTY WAS NOT AN ARMS-LENGTH SALE WHICH WAS THE BEST EVIDENCE OF THE PROPERTY’S VALUE AS OF THE APPLICABLE ASSESSMENT DATE FOR THE YEAR UNDER APPEAL?

POINT II

IF THIS COURT REVERSES THE TAX COURT, SHOULD THIS COURT EXERCISE ORIGINAL JURISDICTION TO REVERSE THE TAX COURT AND ENTER JUDGMENT FOR THE PLAINTIFF REDUCING THE ASSESSMENT ON ITS PROPERTY FOR THE TAX YEAR 2000 TO ITS SALE PRICE OF $760,000? [2]
 The scope of appellate review from a determination of the Tax Court is the same as that applicable to a non-jury determination of any other trial court. Because judges assigned to the Tax Court have special expertise, their findings should not be disturbed unless they are plainly arbitrary or there is a lack of substantial evidence to support them. G & S Co. v. Borough of Eatontown, 6 N.J.Tax 218, 220 (App.Div.1982).
Further, when a municipality’s original tax assessment is appealed, the assessment is presumed to be valid. Pantasote Co. v. City of Passaic, 100 N.J. 408, 412, 495 A.2d 1308 (1985)(citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 175, 87 A.2d 425 (1952)). It is the taxpayer’s burden to prove that the assessment constitutes error. Id. at 413, 495 A.2d 1308 (citing Riverview Gardens v. North Arlington Borough, supra, 9 N.J. at 174, 87 A.2d 425).
In Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952), the Supreme Court elaborated on the presumption in favor of an assessment:
The settled rule is that there is a presumption that an assessment made by the proper authority is correct and the burden of proof is on the taxpayer to show otherwise. And the taxpayer has not met this burden unless he has presented the appellate tribunal with sufficient competent evidence to overcome the presumption, that is, to establish a true valuation of the property at variance with the assessment. In other words, it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to prove a true valuation different from the assessment. Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption.
*14 [ (citations omitted).]
In determining the value of real property for tax purposes, “ ‘[t]he search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller.’ ” Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 281-82, 491 A.2d 1247 (1985) (quoting City of New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 543,189 A.2d 702 (1963)).
In Glen Wall Associates, the Supreme Court noted:
In most instances, a seller wants to maximize price, while a buyer wants to minimize it. Therefore, it is well settled that a bona fide sale of property may be indicative of the true value of the property. Such a sale, however, is not dispositive on the issue of value. We recognize that there may be instances when the sale price may not reflect true value. In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value. Thus, a township is free to rebut evidence of a sale price with evidence that the sale was, for example, not made at arm’s length, was a distress sale, or was a sham.
[Id. at 282, 491 A.2d 1247 (citations omitted)(emphasis added).]
Plaintiff argues that the record does not support the court’s finding that the sale between HUBCO and plaintiff failed to overcome the presumption of the correctness of City’s assessment by defining, positive and certain evidence and that the purchase price did not represent the fair market value for the premises and, thus, the property’s true value for the 2000 assessment. The crux of plaintiffs argument is that the Tax Court ignored the nearly full day of testimony of John Ciña, HUBCO’s Senior Vice-President, who testified that the purchase price that HUBCO received for the sale of the property resulted from an arms-length transaction. Cina stated that because the property had contamination problems, was in poor physical condition, and located in a residential area, the property’s value and marketability had decreased. Plaintiff alleges that the Tax Court ignored the fact that a DER had been recorded and that the property was a non-conforming use.[3] Plaintiff contends that HUBCO utilized the services of *15 consultants and counsel to operate and dispose of the property, it was not forced or rushed to sell the property, it marketed the property by contacting numerous brokers, and the parties were sophisticated enough to understand the problems and issues involved in the purchase contract for the subject property. Plaintiff ai'gues that the reason the sale went forward was because plaintiff was able to put one-third down on the purchase price. Plaintiff contends that Cina’s entire testimony was ignored and not taken into account by the court and should constitute grounds for reversal. We disagree.
The trial took three days to complete.[4] Both sides presented witnesses who underwent direct and cross-examination under oath. Plaintiff offered the testimony of Ciña and Stack, City’s professional real estate appraiser. Cina, himself, testified on July 24, 2003. Defendant offered the testimony of Beisser, its professional real estate appraiser. Exhibits were also produced and entered into evidence. Both sides proffered their expert witnesses who set forth and defended their own valuation assessments.[5] A review of the record reveals that Cina’s testimony was directly and indirectly taken into account by the court. The judge made credibility determinations of the witnesses and the evidence. The twelve-page opinion rendered by Judge Bianco was a direct reflection of those determinations. The court’s decision is soundly grounded in the evidence.
In determining the market value of the property, Beisser testified that he used the sales comparison approach and the income capitalization approach and not the sale price to deteimine the value of the property. He explained in extensive detail the *16 rationale for his approach, setting forth multiple reasons and taking into account the earlier testimony provided by Cina.
The testimony of Beisser, which is reflected in the judge’s findings of fact and conclusion of law was as follows:
A. [T]he subject sale is so far out of line with other comparable sales and market data that it caused me to take a look at it very closely.
I concluded several things. One is, because it’s a bank sale, the seller was unusually motivated. That is, the seller is not in the business of selling, buying, managing or marketing real estate property. The fact is, it is a bank, and as a bank it is required to dispose of properties within a five-year period. It’s bank regulations, and they’re obligated to dispose of properties within a five-year period.
In fact, Mr. Cina, who testified for the bank earlier had mentioned that he was required to dispose of the property within five years but had received extensions of timefi’om bank examiners.
Next the bank inherited the property as a result of the acquisition of the Washington Savings Bank. So, this bank had never purchased the property, and didn’t independently purchase the property, and didn’t evaluate its investment criteria when buying the property.
Next there was no traditional market plan, for the properiy. There were no offering packages that were sent out to multiple interested parties. There was no listing of the property on an industrial or commercial sales property database.
There was no broker involved which left the bank to market the property themselves. There were no marketing materials that I am aware of prepared for the sale of this property.

Mr. Cina testified here, and I found this out later, this didn’t go into my miginal thinking, but Mr. Cina testified that the bank had offered the properiy first to its customers and did not go out to a broad market, but in fact found among its customer base a potential buyer.

He also testified that he didn’t consult with any real estate brokers in marketing the prroperiy. And there were no bidding packages sent out to other interested parties.

So, I concluded that [HUBCO’s] primary motivation was to reduce not reform assets on their balance sheet. In effect, that’s what they did here.
Also, at the time of the sale the vacancy rate of the properiy was unusually high, far above market standards at the time. Market vacancy rate for these types of buildings in that time was between five and ten percent.
This property at that time of the sale, 2000, was operating at about a 50 percent vacancy rate. That no doubtedly (sic) because this is a multi-tenanted, income-producing property — in my mind no doubt affected the purchase price of the property, in large part would cause the purchase price of the property.
Q. And when you say affected the purchase—
A. It affected the sale price of the property, exactly.
Q. In which direction?
A. If would have depressed the sale price of the property because the vacancy rate was so low — or should I say so high.
*17 Secondly, there were some, — I guess thirdly. There were rents in the property that were executed around the sale — date of the sale price and around the date of valuation. Those rents are in the four dollar a square foot range. And with those rents the landlord pays real estate taxes and most other operating expenses.
After making a deduction for operating expenses and capitalizing the result in that income, the rents signed on the date of valuation or near the date of valuation support a value much higher than the $760,000 that this property ultimately sold for, again leading me to believe that vacancy was a critical factor here.
It would appear that vacancy was a critical factor price.
Also, there were several comparable sales at the time, sales of buildings at the time that all ranged between the 12 and 1U dolíais per square foot of gross rentable area range.
This sold at about $6 per square foot, and it’s the only sale I can see in the marketplace that sold this low.
And finally there were some environmental conditions at the property or on the property that may have affected its sale pnce. The properly received a letter of no further action on environmental constraints in 1998. At that time the DEP determined that all the contamination on the property, which was limited to two areas, one area no longer needed any further action by the DEP. That was about a 1,700 square feet of land back with the JD Trucking, which is the one-story transit building in the rear of the property.
1,700 square feet of asphalt paving that needed to be — some areas were excavated there, backfilled, and there was paving put on top of it. That no longer needed monitoring from the DEP. There’s also a 02,000 square foot area of land in the southwest corner of the property where there are some known contaminants. Those contaminants were capped in place. The DEP also issued a letter of no further action on those contaminants with some conditions. The property owner has to continue to maintain the asphalt paving, and if they decide to build anything over that area, they need to consult with DEP in order to — in order to make sure that the proper safety standards are in place and whatever clean-up [steps] are in place or required at the time will be followed. They’re also permitted to construct residential property or residential buildings on this property provided they go back to DEP and get the appropriate clearances.
All of that was resolved in 1998. And as I understand the testimony earlier here, [HIJBCO] was already in negotiations with Warren Diamond and the people who purchased the property prior to 1998 when there were environmental questions about the property. Well, those questions were resolved in 1998 with a letter of no further action from the DEP.
And the way I heard it was that Mr. Cina said they did not go back out and market the property after the environmental conditions were resolved. In fact they went on further and closed the deal with the cinrent—
So, I don’t know whether the property was ever marketed as clean or remediated or with a letter of no further action which absolutely would have affected the purchase price of the property.
So, in other words it was negotiated while the environmental condition was unclear. It was closed token the condition toas cleu r.
[ (emphasis added). ]
*18 Clearly, Beisser identified at least five reasons why the sale price of the subject property was not an accurate reflection of its market price: (1) the transaction was a bank sale; (2) the bank inherited the property; (3) there was no traditional market plan; (4) the vacancy rate was unusually high; and (5) some environmental conditions at the subject property may have affected the sale price. Therefore, the transaction was not arms-length because the purchase price paid for the property was an unreliable indicator of the market price.
Additionally, contrary to plaintiffs contentions, not only was Cina’s testimony taken into account, it was refuted by Beisser. Namely, Beisser refuted Cina’s allegation that the property was marketed. No traditional marketing plan existed, no marketing plans were provided, and no broker was used to sell the property. Also, as to Cina’s contention that the environmental problems also affected the property, Beisser testified that the environmental situation did not impact the value of the subject property after the issuance of the No Further Action letter by the NJDEP.
Thus, because the No Further Action letter was issued in 1998 and the sale of the property did not occur until October 1999, the environmental concerns that Cina alleged should not have been a factor in valuing the property. In fact, Cina’s testimony was again used on cross-examination to not only rebut his testimony that the sale was not compelled or forced but also reaffirmed the opinion set forth by Beisser. The following colloquy took place between Beisser and plaintiffs attorney:
Q. You heard the testimony — you were sitting in the courtroom when you heard [Mr. Gina], the senior vice-president of the bank, testify?
A. Yes, I was here.
Q. And did his testimony in any way change your assumptions?
A. Oh, it confirmed it.
Q. I see. And what did you understand Mr. Cina to say that would confirm that this was a compelled sale?
A. Well, he first of all said that he had a five-year period for which he had to dispose of the asset. The bank examiners had given him two extensions already because of the environmental condition on the property.
They saw that as an extraordinary circumstance and gave him an extension on this five-year period. He also testified that he did not consult with any real estate *19 brokers, winch is common t.o hire and engage a real estate broker to list and ultimately develop a marketing strategy for the property.

Mr. Cina did not do that. Mr. Cina also mentioned that the property ivas environmentally challenged or at least environmentally contaminated and that stopped or stalled much of his attempt to market the property.

He had mentioned that Mr. Diamond was approached to buy the property because lie was a bank customer, not as the result of a marketing effort engaged in by Mr. Cina. So there was no marketing effort on the property, but the Icey thing about the environmental is he began negotiations with Mr. Diamond prior to the closure of the environmental issue, which means the. sale pnce was established or at least being negotiated before the environmental closure.
It was never marketed again on the open market after the letter of no further action. There were no bidding packages performed.

So, when Mr. Cina testified it was clear to me that there ions no marketing strategy for the property. There was no common marketing strategy for the property. There was no bidding package. There was no marketing matenals. There was no listing of the property. There were no signs on the property. He simply went to existing bank customers and asked them if they had any interest.

Q. Did you, prior to the preparation of your appraisal report, did you attempt to determine whether this sale was an arms-length sale? Did you contact either of the parties for the sale?
A. No, I did not contact either party of the sale.
Q. Okay. So you made no effort whatsoever to determine whether in fact it was an arms-length sale.
A. You have to define arms-length. What I did was I went to see if it was reflective of market conditions, and it was not. My conclusion was that it was not.

Even if the two parties were related, if the sale price was around the price demonstrated by other sales and rentals in the market place I would consider it. That was the issue to me.

The issue — what happened here is the sale price is a quarter or a half of what the rest of the market indicated. So, to me it was not a sale that ivas probative of value.
[ (emphasis added).]
In reviewing the opinion of the Tax Court, it is evident that the testimony of all the witnesses, including Cina’s and Stack’s, were considered either directly or indirectly. However, the judge found that the testimony of Beisser was the most persuasive. The judge noted five factors that he considered in finding that the sale of the property was not indicative of its true value. The first factor was the fact that the seller of the property was a bank. The Tax Court noted that HUBCO acquired the property through a merg *20 er and was required to resell the property within five years.[6] 125 Monitor Street, LLC v. Jersey City, supra, 21 N.J.Tax at 241; see also, Whippany Assocs. v. Township of Hanover, 1 N.J.Tax 325, 330 (Tax 1980) (noting that the sale of subject property by a bank which took title in lieu of foreclosure was not a reliable indicator of value since the bank was under greater economic pressure to sell the property than an ideal hypothetical “willing seller”). This factor motivated the bank to sell the property as quickly as possible. The second factor that the court considered was that HUBCO was not in the real estate business and not equipped to operate such a business. Therefore, it had an additional reason to sell the property. Ibid. From HUBCO’s point of view, it was probably a non-performing asset.
The court also noted that the period of vacancy may create a greater incentive to sell the property under duress for a price that is lower than market value. Id. at 242. Here, the property had a vacancy rate of approximately fifty percent when plaintiff purchased it. The other two factors that the court considered which placed the credibility of the sale in doubt included the manner in which the property was marketed and the amount of time that it was marketed. Ibid. The court in effect acknowledged Cina’s testimony that “while HUBCO may have informed the commercial brokers in the area of the availability of the subject property, no attempt was made to secure a broker. The subject property was not listed for sale to the general public and not marketed to anyone except to HUBCO’s own banking customers.” Ibid.
Cina and the two real estate experts discussed the factors that were utilized by the court in making its findings. The judge simply attached more credibility to the findings and conclusions of Beisser. PlaintifPs contention that the court ignored the testimony of Cina is unsupported by the record, including the court’s opinion. While Cina is not specifically mentioned by name, his testimony formed the basis and reasoning for the opinions of both Stack and *21 Beisser. The court accepted the opinions of Beisser when it made its findings of fact and conclusions of law.
As to the reliability of Stack’s comparable sales, the court found that they were unreliable because, in analyzing comparable sales, Stack made adjustments that were too great. Id. at 243-44. The court stated, “adjustments that are too large suggest a lack of comparability between the concerned sales and the subject property and present a misleading indicator of the subject property’s value.” Id. at 244. As a result, the court found that the adjustments made by Stack were not comparable. Ibid.
We are satisfied that plaintiffs contention that the factors testified to by Cina were not considered by the judge in the court’s decision lacks merit. Both Stack and Beisser were present when Cina testified. However, Beisser rebutted the facts testified to by Cina in his testimony. In rendering its opinion, the court in effect made credibility determinations contrary to the testimony presented by Cina. Instead, the judge’s findings of fact were consistent with the testimony and opinions presented by Beisser.
There exists substantial credible evidence in the record to support the Tax Court’s decision. Stated differently, the plaintiff had not produced sufficient credible evidence that the sale price of the property was the true value of the property that was definite, positive and certain in quality and quantity so as to overcome the presumption of validity of the assessment.
Affirmed.

 Plaintiff alleges that the area of the facility is approximately 115,000 square feet while defendant asserts that the area is approximately 116,000 square feet.

 Because the response to the first issue must be answered in the affirmative, we need not address this argument.

 Plaintiff's contention is unsupported by the record. A review of the Tax Court’s opinion explicitly notes that the property is non-conforming because its industrial use and improvements violated several zoning ordinances. 125 Moni *15 tor Street, LLC, supra, 21 N.J.Tax at 236. As for the DER, it was also noted in the opinion. Id. at 237.

 Trial took place on July 24, 2003, August 18, 2003, and August 19, 2003.

 Stack utilized two standard valuation methods: the sales data approach and the capitalization and economic approach. Beisser utilized two standard valuation methods as well: the sales comparison approach and the income capitalization approach.

 At oral argument, both counsel were queried but neither could provide the authority for the requirement that the subject property be sold within five years.