NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
 **Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625-0975
(609) 292-8108 Fax: (609) 984-0805

April 28, 2017

Lawrence J. Freundlich, Esq.
Freundlich & Reisen, LLP
374 Millburn Avenue, Suite 303E
Millburn, New Jersey 07041

Gregory B. Pasquale, Esq.1
Shain, Schaffer & Rafanello, P.C.
150 Morristown Road, Suite 105
Bernardsville, New Jersey 07924

> Re: 290 Davidson Avenue, LLC v. Township of Franklin
> Docket No. 007629-2009
> Docket No. 001599-2010
>
> SHI International Corp. v. Township of Franklin
> Docket No. 001348-2011
> Docket No. 000666-2012

Dear Counsel:

This letter constitutes the court's opinion after trial in the above-referenced matters challenging the assessments on real property for tax years 2009 through 2012. For the reasons stated more fully below, the assessments are reduced for each tax year.

---

1       Richard A. Rafanello, Esq., tried these matters on behalf of defendant. Mr. Rafanello passed away after trial. Mr. Pasquale has taken over representation of defendant.

## I. Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

These appeals concern real property in Franklin Township, Somerset County. The property, designated in the records of the township as Block 468.12, Lot 11.02, is commonly known as 290 Davidson Avenue.

The subject property is 34.179 acres on which sits a five-story office building constructed in 1988 with approximately 433,343 square feet of rentable space. The building is of high quality, considered to be a Class A office building, and is designed in two wings, connected at the lower level and first floor by a 40-feet-high atrium. There is a main entrance at the atrium with separate entranceways and plazas for each wing. The wings can effectively operate separately, as each has elevators, lavatories, loading docks, and stairs leading directly out of the building. The building has a number of attractive features, including a cafeteria, dining rooms, and a conference center. A portion of the building has raised floors to accommodate infrastructure for information technology. At the time of construction of the subject this feature was state of the art; raised floors for this purpose are now obsolete. An ancillary building of approximately 15,400 square feet houses a fitness center and nurse's station for use of the occupants of the main building.

There is adequate on-site parking and other site improvements at the subject property, including landscaped areas, outdoor dining areas, and paved parking for 1,890 vehicles. The subject property is located in the CB Central Business Zone and its use as an office building comports with zoning controls. The neighborhood is comprised primarily of office buildings, hotels, motels, and the Garden State Exhibit Center, all in close proximity to Interchange 10 of Route 287. The subject is one of the largest office buildings in the area.

For several years, the telecommunications company AT&T occupied the subject property as a tenant. In 2002, AT&T vacated the property prior to the end of its lease. Through a business arrangement with AT&T, Mack Cali Realty Corporation ("Mack Cali"), a well-known entity in the real estate market, continued to pay the rent on AT&T's lease through 2009. During that time, the subject property remained largely vacant, although Mack Cali subleased approximately 10,000 square feet to a tenant and licensed use of the parking lot to a nearby catering hall and another business for excess parking.

Beginning in 2005, the then-owner of the subject property, aware of the approaching end of the AT&T lease, began efforts to market the property for lease or sale. Those efforts, which included a website, flyer, and outreach to potential tenants by both the owner's principle and a broker, were unsuccessful. The prior owner believed the primary rental market for the subject at that time to be tenants in the telecommunications and finance industries. Perceiving those markets to be in "major contraction" in the Franklin Township area, having observed a large number of vacancies in office buildings in the subject property's neighborhood, and having been unsuccessful at leasing the subject, the then-owner of the subject decided to allow transfer of title to its lender through a deed in lieu of foreclosure. At the time of the transfer, approximately $34 million remained unpaid on the mortgage.

As of October 1, 2008 and October 1, 2009, the first two valuation dates at issues here, the property was owned by plaintiff 290 Davidson Avenue, LLC. The property was vacant on those dates. Although Mack Cali was paying rent on the AT&T lease on October 1, 2008, it stopped paying rent on April 30, 2009. Thus, as of the October 1, 2009 valuation date, the building was vacant and generating no income.

Plaintiff SHI International Corp. ("SHI") purchased the subject property on July 12, 2010 for $11,340,001.[2]  At the time of the purchase, SHI was conducting its business out of a building it owned in Piscataway Township, Middlesex County.  Although the subject property was significantly larger than SHI needed for its operations at the time, SHI determined that it would purchase the subject, renovate the interior, and relocate to the building with the intention ultimately of growing its business sufficiently to occupy all or most of the structure.  After the purchase, SHI spent approximately $20 million renovating approximately 250,000 square feet of the building. The remainder of the building, although upgraded, is in shell condition.

In October 2011, SHI moved into the renovated portion of the building.  It is marketing for lease the approximately 40% of the building in shell condition that it is not occupying.

For tax years 2009 through 2012, the subject property was assessed as follows:

| Land | $ 5,420,000 |
|---|---|
| Improvement | $53,122,000 |
| Total | $58,542,000 |

Because the municipality implemented a district-wide reassessment for each tax year under appeal, the average ratio for each tax year is presumed to be 100% and the assessment is presumed to reflect true market value.  See N.J.S.A. 54:1-35a.

Plaintiff 290 Davidson Avenue, LLC filed timely Complaints challenging the tax years 2009, 2010 and 2011 assessments on the subject property.  On October 15, 2012, the court entered an Order substituting SHI as plaintiff in the tax year 2011 appeal, given the July 2010 change in ownership.   See Prime Accounting Dept v. Township of Carney's Point, 212 N.J. 493

---

[2]     According to the report of plaintiffs' expert appraiser, the grantor of the property was HMAC 1999-Phi Somerset Grove II, LLC.  The relationship of that entity to 290 Davidson Avenue, LLC was not explained at trial; nor is it material to the court's analysis.

(2013)(allowing amendment of Complaint naming prior owner of subject property as plaintiff, where Complaint correctly identified the block, lot, and street address of property).

SHI filed a timely Complaint challenging the tax year 2012 assessment on the subject property. Defendant Franklin Township filed a Counterclaim with respect to tax year 2009 only.

The four Complaints and one Counterclaim were consolidated for purposes of trial and this opinion. At trial, the two plaintiffs were represented by the same counsel and presented a unified case in support of reduction of the assessments.

During the three-day trial, each party presented an expert real estate appraiser to offer opinions of the true market value of the subject property on the relevant valuation dates. The opinions of the experts, which diverged widely, are summarized as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Valuation Date | 10/1/2008 | 10/1/2009 | 10/1/2010 | 10/1/2011 |
| | | | | |
| Plaintiffs' Expert | $24,000,000 | $20,000,000 | $17,000,000 | $26,000,000 |
| Defendant's Expert | $79,000,000 | $74,000,000 | $79,000,000 | $79,000,000 |

Although the experts agree that the highest and best use of the subject property is as an income-producing office building rented to tenants, the disparity of their opinions of value can be traced primarily to two areas of disagreement: the vacancy and collection rate and the capitalization rate to be applied under the income capitalization approach to determining value.

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, supra, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs

of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At the close of plaintiffs' proofs, the court denied the municipality's motion to dismiss the Complaints for failure to overcome the presumption of correctness attached to the assessments. The court placed its findings of fact and conclusions of law on the record in the presence of counsel. Those findings and conclusions will not be repeated here at length. Put succinctly, the court concluded that the opinions of value offered by plaintiffs' expert, which were based on an accepted methodology for determining value and on evidence of the type often used for such determinations, if accepted as true, raised doubt in the court's mind with respect to whether the assessments on the subject property exceeded true market for the tax years in question.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

A.      Approach to Valuation

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

Both experts relied primarily on the income capitalization approach to valuing the subject property. The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J.

266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed. 2008). The court finds that the income capitalization approach is the best method for determining the value of the subject property, an income-producing office building.

B.    Calculation of Value Using Income Approach

Determining the value of real property pursuant to the income approach can be summarized as follows:

> Market Rent
> x    Square Footage
> Potential Gross Income
>
> -    Vacancy and Collection Losses
> Effective Gross Income
>
> -    Operating Expenses
> Net Operating Income
>
> ÷    Capitalization Rate
> Value of Property

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008).

1.    Market Rent

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270. This differs from the actual rental income realized on the property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, actual

9

income is a significant probative factor in the inquiry as to economic income. Id. at 30. "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area." Ibid.

Plaintiffs' expert identified five leases from competing office buildings that he considered reflective of market rent for the subject. After application of adjustments for market conditions, location, and building quality, he opined adjusted rents per square foot of

| | |
|---|---|
| Tax Year 2009 | $19.31 to $24.04 |
| Tax Year 2010 | $17.58 to $22.01 |
| Tax Year 2011 | $17.14 to $21.25 |
| Tax Year 2012 | $19.78 to $33.91 |

The expert opined market rents of

| | |
|---|---|
| Tax Year 2009 | $22.00 |
| Tax Year 2010 | $20.00 |
| Tax Year 2011 | $19.00 |
| Tax Year 2012 | $28.00 |

The expert's proffered market rents are gross rents, with the tenant paying no expenses except tenant electric charges. See American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 572 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000).

Defendant's expert, on the other hand, identified nine leases from competing office buildings that he considered reflective of market rent for the subject. After application of adjustments for size, building quality, and expenses (to convert gross rents to triple net rents), he opined adjusted rents per square foot of

| | |
|---|---|
| Tax Year 2009 | $15.79 to $16.43 |
| Tax Year 2010 | $15.24 to $19.48 |
| Tax Year 2011 | $12.35 to $19.48 |
| Tax Year 2012 | $12.35 to $20.70 |

Defendant's expert opined market rents of

| | |
|---|---|
| Tax Year 2009 | $16.00 |
| Tax Year 2010 | $16.00 |
| Tax Year 2011 | $16.00 |
| Tax Year 2012 | $17.00 |

The expert's proffered market rents are triple net rents, with the tenant paying all but a few expenses. See N.J. Indus. Props., Inc. v. Y.C. & V.L., Inc., 100 N.J. 32, 434 (1985). The expert opined that triple net rent would be appropriate because the subject is most likely to be occupied by a single tenant, as has been its history, and single tenants tend to rent on a triple-net basis.

The court finds the economic rents offered by defendant's expert to be more credible. The primary reason for this determination is that defendant's expert reviewed lease abstracts for each of his comparable leases and confirmed the information on those abstracts with parties to the leases or those involved in the lease negotiations. While plaintiffs' attorney raised some concerning points during cross-examination of defendant's expert, including that one of the expert's comparable leases arose from a sale-leaseback transaction, the court is satisfied that the expert confirmed the arm's length nature of that transaction and offered a credible opinion of market rent. The court will stabilize the rent at $16.00 per square foot for tax year 2012.

The market rent offered by plaintiffs' expert was less credible. The expert was unable to verify the terms of the leases upon which he relied. He did not review the leases themselves or

11

abstracts of the leases. He instead relied on information in files he maintains in his office, the source of which he could not identify. While the court has no reason to doubt that the expert believe the information to be accurate, the record contains no evidence on which the court could make a determination that the lease information that formed the basis of plaintiffs' expert's opinion was credible.

2.     Building Size

Plaintiffs' expert identified the subject property has having 465,696 of rental space. This figure is comprised of 450,313 square feet in the main building and 15,383 square feet in the ancillary building.

Defendant's expert identified the subject property has having 448,743 of rental space. This figure is comprised of 433,343 square feet in the main building and 15,400 square feet in the ancillary building.

The discrepancy was not explained at trial and amounts to approximately 17,000 square feet in the main building. The figure of defendant's expert is approximately 4% smaller than that of plaintiffs' expert. The court will give the benefit of the doubt to the taxpayers and adopt the rentable space figure opined by defendant's expert.

3.     Vacancy and Collection Rate

A determination of value under the income-capitalization approach must include "a vacancy and loss allowance over the economic life of the property, using, in some measure, the actual history, but placing more emphasis on the trends in the most recent years." First Republic Corp. of Am. v. Borough of East Newark, 16 N.J. Tax 568, 580 (App. Div. 1997), aff'd, 17 N.J. Tax 531 (App. Div. 1998). "The important principle implicated in the estimate of a vacancy and

loss allowance is that the estimate is simply the appraiser's informed judgment of the long-term

and durability of the income stream." Ibid. As Judge Crabtree explained:

> [The] determination involves more than uncritical acceptance of the vacancy rates prevailing in the subject on the valuation dates or, for that matter, the office building vacancy rates prevailing in the subject's market area. Rather, a vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream.
>
> [University Plaza Realty Corp. v. City of Hackensack, 12 N.J. Tax 354, 369 (Tax 1992), aff'd, 264 N.J. Super. 353 (App. Div.), certif. denied, 134 N.J. 481 (1993)(citation omitted).]

A vacancy and collection rate should not be "unduly influenced by the experience of the

subject property during a period of financial turmoil," but also cannot "totally ignore[] the history

of the subject property . . . ." Pine Plaza Assocs., LLC v. Township of Hanover, 16 N.J. Tax 194,

205 (Tax 1996).

The actual history at the subject property is unusual. It is undisputed the subject was vacant

from 2002 through 2011. The property owner, however, collected rent on the vacant space from

2002 through April 30, 2009. That rent was not paid by the tenant who vacated the space, but by

Mack Cali, a well-known and experienced player in the New Jersey office rental market.

Plaintiff's expert considers the subject to have been vacant during the entire period, despite

the collection of rent from Mack Cali by the property owner. The expert's theory is that although

Mack Cali entered into a business arrangement with AT&T to pay the rent on AT&T's lease, it is

reasonable to assume that Mack Cali was attempting to market the subject property to subtenants

during the term of AT&T's lease. There is no evidence in the record detailing Mack Cali's

marketing efforts, if any. It is, however, undisputed that Mack Cali subleased approximately

10,000 square feet of the subject and licensed the use of the parking lot while it was paying rent on AT&T's lease.

Defendant's expert takes the view that the subject property was fully occupied until April 30, 2009, when Mack Cali stopped paying rent on AT&T's lease. Defendant's expert takes the view that there is no evidence that Mack Cali was truly motivated to rent the subject property. In addition, the expert opines that the property owner at the time, receiving steady rent from Mack Cali, was not truly motivated to market the property until the AT&T lease terminated in 2009.

The court concludes that as of the first valuation date at issue here, October 1, 2008, the property owner, aware of the upcoming termination date of the AT&T lease in April 2009, and of its existing sizable mortgage on the subject property, made sincere efforts to market the property for rent. A principle of the then-owner of the subject credibly testified that he approached several brokers in an effort to market the property. He also credibly testified that a number of brokers declined to enter into an agreement to market the subject property. One broker did agree to market the property, which is evidenced by a flyer touting the subject for sale or rent admitted at trial.

The principle convincingly testified that his efforts to market the property were entirely unsuccessful. He also credibly testified that in light of the high vacancy rate at similar buildings in the immediate vicinity of the subject property, a contraction in the industries of the target tenant market for the subject, and the lack of success at marketing the building, the then-owner of the subject decided to transfer ownership of the property to its lender in lieu of foreclosure. The court concludes that a decision by a sophisticated player in the real estate market to transfer a deed in lieu of foreclosure on a Class A office building is powerful evidence of a depressed rental market and supports the conclusion that the subject property was vacant literally on April 30, 2009 and

14

effectively as of October 1, 2008.  The subject property remained vacant until October 2011, when SHI occupied a portion of the building as owner-occupant.

The vacancy experienced at the subject property reflected high vacancy rates throughout the region.  The report on which plaintiffs' expert relied shows vacancy rates in the Hillsborough/ Franklin office market in the third quarter of 2008 at 30.2%.  By the third quarter of 2009, the vacancy rate rose to 32.6%.  As of the third quarter of 2010, the vacancy rate was 34.9%.  Finally, in the third quarter of 2011 the vacancy rate was reported at 35.4%.  These are sobering figures for market participants negotiating purchase prices for office buildings in Franklin Township on the valuation dates in question here.

Defendant's cross-examination of plaintiffs' expert with respect to his opined vacancy rate was not effective.  While it is true that the report on which the expert relied concerned both Hillsborough Township and Franklin Township, and that the expert did not know the number of office buildings from each municipality reflected in the report, these facts do not materially undermine the expert's opinion.  Hillsborough Township and Franklin Township are adjoining municipalities in Somerset County with similar features.  Defendant introduced no evidence suggesting that it was inappropriate or inaccurate for the office building vacancy rate for the two municipalities to be reflected in a combined statistic.  Nor did defendant offer any evidence that the Franklin Township office rental market was anything other than depressed on the relevant valuation dates.

The 10% vacancy and collection loss rate opined by defendant's expert does not reflect either the history of the subject or the prevailing experience of the Franklin Township office rental market.  The expert's testimony and report shed little light on how he arrived at the 10% rate.  The expert's report merely states that the 10% vacancy rate was selected "[b]ased upon the historical

15

vacancy at the subject property, as well as the physical characteristics of the building . . . ." During his direct examination, the expert was asked if "a study" was "brought to his attention" by defendant's counsel and whether that study showed vacancy rates consistent with the expert's opinion. The expert answered both questions affirmatively. The "study," however, was not marked as an exhibit or moved into evidence. Nor is the "study" mentioned in the expert's report, suggesting it was "brought to his attention" by defendant's counsel after the expert reached his vacancy and collection rate opinion in an effort to bolster his testimony.

The court accepts the vacancy and collection rate offered by plaintiffs' expert as more credible than that offered by defendant's expert. The court is cognizant, however, of the need to stabilize the vacancy and collection rate over a reasonable holding period for the subject property. The extraordinarily high vacancy rates reflected it the market study upon which plaintiffs' expert relied are reflective of the devastating economic downturn that began in 2008. The years following that downturn have been described as "the deepest and longest economic contraction since the Great Depression," defined by "more job losses than any contraction since the Great Depression as well as a painfully slow recovery." Steven A. Ramirez, The Virtues of Private Securities Litigation: An Historic and Macroeconomic Perspective, 45 Loy. U. Chi. L.J. 669, 684-85 (2014). The court concludes that market participants on the relevant valuation dates would expect an improvement in the office rental market over the long term, even during the depths of the recession.

The court concludes, therefore, that the vacancy and collection rates opined by plaintiffs' expert will be tempered to reflect a reasonable holding period for the subject property. The court concludes vacancy and collections rates of 22% for tax years 2009 and 2010 and 25% for 2011 and 2012.

4.      Operating Expenses

Having found the triple net market rent opined by defendant's expert to be credible market rent for the subject property, the court must limit market expenses to the few costs incurred by a property owner receiving triple net rent. Defendant's expert opined a stabilized market expense of 10% of rent. This expense is composed of an allowance for reserves for necessary building repairs and upgrades of 2%; leasing commissions of 5%; and a management expense of 3%. These figures are supported by market data and were not effectively challenged on cross-examination of the expert. The court adopts the expenses opined by defendant's expert.

5.      Capitalization Rate

The overall capitalization rate is an "income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value . . . ." Appraisal Institute, The Appraisal of Real Estate at 462. The overall capitalization rate is "used to convert net operating income into an indication of overall property value." Ibid.

Defendant's expert used the Band of Investment technique to calculate an overall capitalization rate. "This technique is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, supra, 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate 467 (10th ed 1992)).

> Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors

17

> must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
>
> [Appraisal Institute, Appraisal of Real Estate 505 (13th ed 2008).]

In "using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Hull Junction Holding, supra, 16 N.J. Tax at 82 (quoting Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 279-80 (1985)). "For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Id. at 82-83. "Relevant data is also collected and published by . . . Korpacz Real Estate Investor Survey." Id. at 83. "By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

The expert offered the following capitalization rates: 7.50% for tax year 2009; 8.00% for tax year 2010; 7.50% for tax year 2011; and 7.25% for tax year 2012. He did not include a tax component in the rate because the tenant under a triple net lease would pay taxes.

Plaintiffs' expert, who did not use the Band of Investment technique, instead relied on surveys of transactions involving the sales of office buildings broken down by region. He offered higher capitalization rates: 11.0% for tax year 2009; 12.0% for tax year 2010; 11.5% for tax year 2011; and 11.0% for tax year 2012. To these capitalization rates, the expert added percentages reflecting the local property taxes that would be due were the expert's opinion of value to be adopted: 1.8% for tax year 2009; 1.8% for tax year 2010; 2.1% for tax year 2011; and 2.1% for

tax year 2012. Having opined a market gross rent, plaintiffs' expert opined that the property owner would be responsible for local property taxes on the subject property.

The court finds the capitalization rates opined by defendant's expert to be more credible. The capitalization rates opined by plaintiffs' expert reflect heightened risk to investors. The expert conceded on cross-examination that he used the highest figures in the ranges of capitalization rates reported in the surveys on which he relied. While the court agrees that the subject property poses some risk to investors, given its history of vacancy and the high vacancy rates in Franklin Township on the relevant valuation dates, the court agrees with defendant's expert that this risk is substantially reflected in an elevated vacancy and collection rate. To apply both a high vacancy and collection rate and an unnecessarily high capitalization rate would, in effect, give double weight to the impact of the contracting office rental market on the valuation dates. Still, the court concludes that the capitalization rates opined by defendant's expert do not adequately reflect the risk involved in the purchase of the subject on the relevant valuation dates. The court will adjust the capitalization rates as follows: 9.00% for tax year 2009; 9.00% for tax year 2010; 9.00% for tax year 2011; and 9.00% for tax year 2012.

6. Calculation of Value

| | | 10/01/2008 | 10/01/2009 |
|---|---|---|---|
| + | Market Rent ($16.00 x 448,743) | $ 7,179,888 | $ 7,179,888 |
| | Potential Gross Income (PGI) | $ 7,179,888 | $ 7,179,888 |
| - | Vacancy & Collection (22% PGI) | $ 1,579,575 | $ 1,579,575 |
| | Effective Gross Income (EGI) | $ 5,600,313 | $ 5,600,313 |
| - | Expenses (10% of EGI) | $ 560,031 | $ 560,031 |
| | Net Operating Income | $ 5,040,282 | $ 5,040,282 |
| ÷ | Capitalization Rate | .0900 | .0900 |
| | Value of Property | $56,003,133 | $56,003,133 |

19

|   |   | 10/01/2010 | 10/01/2011 |
|---|---|---|---|
| + | Market Rent ($16.00 x 448,743) | $ 7,179,888 | $ 7,179,888 |
|   | Potential Gross Income (PGI) | $ 7,179,888 | $ 7,179,888 |
|   |   |   |   |
| - | Vacancy & Collection (25% PGI) | $ 1,794,972 | $ 1,794,972 |
|   | Effective Gross Income (EGI) | $ 5,384,916 | $ 5,384,916 |
|   |   |   |   |
| - | Expenses (10% of EGI) | $ 538,491 | $ 538,491 |
|   | Net Operating Income | $ 4,846,425 | $ 4,846,425 |
|   |   |   |   |
| ÷ | Capitalization Rate | .0900 | .0900 |
|   | Value of Property | $53,849,166 | $53,849,166 |

For tax year 2009, the true market value of the subject property as of October 1, 2008 was $56,000,000.

For tax year 2010, the true market value of the subject property as of October 1, 2009 was $56,000,000

For tax year 2011, the true market value of the subject property as of October 1, 2010 was $53,800,000.

For tax year 2012, the true market value of the subject property as of October 1, 2011 was $53,800,000.

The court pauses to recognize that the subject property was purchased by SHI in July 2010 for $11,340,001, after which SHI spent an additional approximately $20 million to gut and renovate the structure to meet SHI's specifications for occupation. Neither expert relied on the subject sale as evidence of true market value, likely because the sale was considered distressed, given that it followed transfer of title by deed in lieu of foreclosure. One expert commented during his testimony that SHI obtained the subject property at a very favorable price because of the unusual circumstances leading up to the sale and because of SHI's willingness to invest a large amount of money in the property to create what it hoped would be sufficient space for the company

to grow its business in the long term.  Given these facts, the court does not consider the July 2010 sales price persuasive on the issue of true market value.[3]

C.      Applying Chapter 123

Because the municipality implemented a district-wide reassessment for each tax year at issue, Chapter 123 does not apply.  N.J.S.A. 54:51A-6d.  The assessment on the property, therefore, will be set at 100% of value for each tax year.

A Judgment establishing the assessment for the subject property for tax year 2009 will be entered as follows:

|  |  |
|---|---|
| Land | $  5,420,000 |
| Improvement | $50,580,000 |
| Total | $56,000,000 |

---

[3]  Plaintiffs' expert used the comparable sales approach in reaching his opinions of values.  The sales comparison approach is "[t]he process of deriving a value indication for the subject property by comparing similar properties that have recently sold with the property being appraised, identifying appropriate units of comparison, and making adjustments to the sales prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-driven elements of comparison."  The Appraisal of Real Estate, supra, at 297.  This approach usually provides the primary indication of market value of "properties that are not purchased primarily for their income-producing characteristics."  Id. at 300.  Because the record contains sufficient, reliable evidence to determine the value of the subject property based on the income approach for this income-producing property, the court uses that approach to determine value.  In addition, the court notes that many of the sales on which plaintiffs' expert relied were of properties with long-term leases in place.  The sales prices on these transactions likely represent not true market value, but leased fee value.  That is, the parties to the transfer of real property with a long-term lease in place are likely to arrive at purchase price that reflects the present day value of the income stream resulting from the lease.  An existing lease might be at, below, or above, market rent.  A purchase price determined based on the income generated by an existing lease, therefore, might not accurately reflect market value, which is the foundation of a local property tax assessment.  Because the sale of a leased fee interest will not necessarily reflect market value "when analyzing a lease fee interest, it is essential that the appraiser analyze all of the economic benefits or disadvantages created by the lease."  International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 423 (Tax 2004).  Plaintiffs' expert did not make any such analysis.

A Judgment establishing the assessment for the subject property for tax year 2010 will be entered as follows:

| | |
|---|---|
| Land | $ 5,420,000 |
| Improvement | $50,580,000 |
| Total | $56,000,000 |

A Judgment establishing the assessment for the subject property for tax year 2011 will be entered as follows:

| | |
|---|---|
| Land | $ 5,420,000 |
| Improvement | $48,380,000 |
| Total | $53,800,000 |

A Judgment establishing the assessment for the subject property for tax year 2012 will be entered as follows:

| | |
|---|---|
| Land | $ 5,420,000 |
| Improvement | $48,380,000 |
| Total | $53,800,000 |

Very truly yours,

/s/ Hon. Patrick DeAlmeida, P.J.T.C.