**TAX COURT OF NEW JERSEY**



JOSHUA D. NOVIN
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

January 31, 2025

Anthony Marchese, Esq.
Chiesa Shahinian & Giantomasi, P.C.
105 Eisenhower Parkway
Roseland, New Jersey 07068

Lee Turner, Esq.
Florio Kenny Raval, L.L.P.
125 Chubb Avenue
Suite 310 N
Lyndhurst, New Jersey 07071

> Re: <u>Madison Bulldog Leasing Co. c/o Regan Co. v. Paterson City</u>
> Docket Nos. 007271-2021, 005248-2022, 005150-2023, and 001389-2024

Dear Mr. Marchese and Mr. Turner:

This letter constitutes the court's opinion following trial of the local property tax appeals instituted by plaintiff, Madison Bulldog Leasing Co. ("Madison Bulldog"). Madison Bulldog challenges the 2021, 2022, 2023, and 2024 tax year assessments on certain improved property in Paterson City ("Paterson").

For the reasons stated more fully below, the court reduces the 2021, 2022, 2023, and 2024 tax year assessments.

### I. Procedural History and Factual Findings

Pursuant to <u>R.</u> 1:7-4, the court makes the following findings of fact and conclusions of law based on the pleadings and evidence and testimony adduced during trial.

Madison Bulldog is the owner of the real property located at 446-460 E. 19th Street, Paterson, New Jersey (the "subject property"). 446-460 East 19th Street Urban Renewal L.P.






("Urban Renewal") is the lessee of the subject property and developer of the improvements constructed thereon. The subject property is identified on Paterson's municipal tax map as block 3301, lot 10.[1]

The subject property is a rectangular-shaped parcel comprising 0.4307-acres. The real property is improved with a four-story brick and concrete, multi-family, affordable housing apartment building and surface parking lot.[2][3] The building was formerly utilized as a silk factory before being converted to an apartment building in or around 1999. The building has a gross area

---

[1] On April 7, 1998, Urban Renewal and Paterson entered into a Financial Agreement pursuant to the Long-Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -22 (the "Financial Agreement"). The Financial Agreement provides that in consideration for Urban Renewal's development and construction of an apartment building, the subject property will be afforded a thirty-year local property tax exemption. In lieu of local property tax payments, Urban Renewal must pay Paterson an annual service charge representing the greater of: (i) 8.5% of the subject property's annual gross revenues, or (ii) an adjustable percentage of the real estate taxes that would otherwise be due.

[2] On December 3, 1998, Urban Renewal and Paterson entered into an Affordable Housing Agreement Declaration of Covenants, Conditions and Restrictions (the "Affordable Housing Agreement"). The Affordable Housing Agreement required Urban Renewal, for a term of thirty (30) years, to lease all apartments units in the subject property only to income-eligible households. The Affordable Housing Agreement was recorded on January 20, 1999 in the Passaic County Clerk's Office in Book Q198, Page 158.

[3] On or about December 3, 2001, Madison Bulldog, Urban Renewal, and the New Jersey Housing and Mortgage Finance Agency (the "Agency") entered in a Deed of Easement and Restrictive Covenant for Extended Low-Income Occupancy for the subject property (the "Extended Low Income Occupancy Agreement"). The Extended Low-Income Occupancy Agreement was recorded on January 8, 2002 in the Passaic County Clerk's Office in Book D350, Page 254. The Extended Low-Income Occupancy Agreement restricts occupancy of the subject property's 19 apartment units to income eligible occupants. In consideration for $197,973 in Low-Income Housing Tax Credits ("LIHTC"), the subject property must retain its occupancy and rent restrictions for a minimum of thirty years. The LIHTC program has been described as "the most important resource for creating affordable housing in the United States today. Created by the Tax Reform Act of 1986, the LIHTC program gives State and local LIHTC-allocating agencies the equivalent of approximately $10 billion in annual . . . authority to issue tax credits for the acquisition, rehabilitation, or new construction of rental housing targeted to lower-income households." U.S. Department of Housing and Urban Development, Office of Policy Development and Research, https://www.huduser.gov/portal/datasets/lihtc.html (Last visited on January 10, 2025).






of approximately 26,880 square feet and contains 19 apartment units. The subject property contains 13 two-bedroom apartments and 6 three-bedroom apartments.[4]

During trial, Madison Bulldog elicited testimony from a New Jersey certified general real estate appraiser who was accepted by the court, without objection, as an expert in the real property valuation field (the "expert"). The expert prepared an appraisal report expressing his opinions of the subject property's true market value as of the October 1, 2020, October 1, 2021, October 1, 2022, and October 1, 2023 valuation dates. The appraisal report contained numerous photographs of the subject property's interior and exterior.

As of the valuation date, the subject property's tax assessments, implied equalized values, and the expert's value conclusions are set forth below:

| Valuation date | Tax assessment | Director's average ratio of assessed to true value | Implied equalized value | Madison Bulldog's expert's opinion |
|---|---|---|---|---|
| 10/1/2020 | $2,985,900 | 76.25% | $3,915,934 | $1,424,000 |
| 10/1/2021 | $2,985,900 | 67.98% | $4,392,321 | $1,401,000 |
| 10/1/2022 | $2,985,900 | 59.35% | $5,031,002 | $1,518,000 |
| 10/1/2023 | $2,985,900 | 51.20% | $5,831,835 | $1,475,000 |

The testimony elicited during trial, along with the expert's photographs, depict a former four-story brick and concrete factory building constructed in or about the 1920's and converted into an apartment building, that is in good condition. The interior photographs reveal hallways featuring painted sheetrock walls, ceramic and vinyl/linoleum tile flooring, and overhead fluorescent lighting.

In addition, the photographs of several representative apartment units disclose painted

---

[4] The subject property contains eleven 2-bedroom apartment units each featuring one 3-fixture bathroom, and two 2-bedroom apartment units both having one 3-fixture bathroom and one 2-fixture bathroom. The 3-bedroom apartment units all have two 3-fixture bathrooms.






sheetrock walls, vinyl/linoleum tile flooring in the kitchens, and carpeting or vinyl composite flooring in the living areas and bedrooms. The kitchens are appointed with ordinary wood upper and lower cabinetry and Formica style countertops. Each kitchen is equipped with a stainless-steel sink, combination range/oven, and a refrigerator. The full bathrooms feature ceramic wall and floor tiling, a toilet, a sink, and a bathtub/shower.

The apartments contain hot water baseboard heating. Air conditioning is available by individual window units. The photographs further depict an unfinished basement with individually metered electric service and two newer gas-fired hot water boilers. The subject property is 100% sprinklered. The subject property's roof contains an array of solar panels.

The building's amenities feature a community room containing vinyl/linoleum tile flooring, painted sheetrock walls, overhead fluorescent lighting, and a two-fixture bathroom. The room is equipped with tables and chairs. In addition, the building contains a laundry room with three for-pay washers and dryers and a surface parking lot for approximately nineteen automobiles. The building is serviced by a single passenger elevator.

The subject property is located between Ninth Avenue and Tenth Avenue in Paterson's Fourth Ward Redevelopment RA-2 zoning district, approximately 9 blocks from State Route 20. The use of the subject property as a multi-family apartment building is a permitted use in the Fourth Ward Redevelopment RA-2 zoning district.

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of






proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is

adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998).

A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See

Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and

quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105

(1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that

raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC,

18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the

court "must accept such evidence as true and accord the plaintiff all legitimate inferences which

can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142

N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be

'sufficient to determine the value of the property under appeal, thereby establishing the existence

of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v.

East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey

City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the

presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make

a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax

41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39

(App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is

nonetheless required to determine if the party challenging the tax assessments has overcome the






presumption of validity. If the court concludes that the challenging party has not carried its burden, dismissal of the actions is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording Madison Bulldog all reasonable inferences that could be deduced from the evidence presented, the court finds that Madison Bulldog produced cogent evidence sufficient to overcome the presumption of validity. The expert's opinions, if accepted by the court as true, raise debatable questions as to the validity of the subject property's tax assessments.

### B. Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Determining the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, the expert opined, and the court agrees, that the highest and best use of the subject property, as vacant and as improved, is as a multi-family apartment building.

### C. Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor St. LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004), aff'd, 23 N.J. Tax 9 (App. Div. 2005) (citing Samuel Hird & Sons, Inc., 87 N.J. Super. at 72); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244 (Tax 1980). "There are three traditional appraisal






methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (internal citation omitted). "The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of N.Y. v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610 (Tax 1985). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co., 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51 (Tax 1982).

1. Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Vill. Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996).

The income capitalization approach is

> based on the principle of anticipation, which states that value is created by the expectation of benefits to be derived in the future. In other words, the value of an apartment property reflects what a prudent purchaser-investor would pay for the present worth of an anticipated annual income stream and the reversionary benefit to be realized at the end of the anticipated holding period.
>
> [Appraisal Institute, The Valuation of Apartment Properties, 97 (2nd ed. 2008).]






Thus, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value. As Judge Hopkins succinctly stated, in valuing a property using the income capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Here, the expert expressed, and the court agrees, that the income capitalization approach is the most appropriate method to derive an estimate of the subject property's true or market value.

a. Market or Economic Rent

The first and often most critical "step in applying the income approach is to accurately forecast the future income and expenses associated with ownership of the property." The Valuation of Apartment Properties, at 97. Forecasting a property's gross rental income requires an expert to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments, 108 N.J. at 270.

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). Notably, the market rent ascribed to a property may






differ substantially from the "contract rent," or actual rent collected by the owner of the property, which may be below market rates. Parkview Vill. Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

Absent contrary convincing evidence, the actual rents paid in a well-managed apartment complex are clear evidence of economic rent. G & S Co. v. Borough of Eatontown, 2 N.J. Tax 94, 98 (Tax 1980), aff'd, 6 N.J. Tax 218 (App. Div. 1982). In Parkview Vill. Assocs. our Supreme Court explained that:

> [i]n the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project . . . functioning as customary with leases of relatively short length, should be deemed *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court . . . should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent.
>
> [Parkview Vill. Assocs., 62 N.J. at 34.]

Hence, when an apartment building is being commercially operated and is well-managed, the court shall accord the taxpayer a presumption that the actual rents collected, as of the assessing date, are equivalent to the economic rent. Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 276 (1985).[5]

Here, the expert testified that he personally reviewed the subject property's nineteen leases and that all of them are for one-year terms. Moreover, because the subject property is rent

---

[5] A taxing district may overcome this presumption by presenting "'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties." Parkway Vill. Apartments Co., 108 N.J. at 272; see also Glen Wall Assocs., 99 N.J. at 276; Equitable Life Assur. Soc. of US v. Secaucus Town, 16 N.J. Tax 463, 466-67 (App. Div. 1996); G & S Co. v. Eatontown, 2 N.J. Tax at 94.






restricted affordable housing and is subject to the provisions of the Affordable Housing Agreement and Extended Low Income Occupancy Agreement, the rents that Urban Renewal can charge are specifically limited by governmental regulations. In addition, the evidence offered during trial demonstrates that the subject property is commercially operated, and according to the expert, being appropriately maintained and managed. Thus, in the expert's opinion, the subject property's actual rents are conclusive evidence of economic rent.

Additionally, the court emphasizes that Paterson presented no convincing evidence during trial that: (i) the property is not well managed, (ii) the leases are old, long-term leases, or (iii) based on an analysis of four comparable apartment properties, the leases are not economic. See Parkway Vill. Apartments Co., 108 N.J. at 272.

Thus, the court finds the expert's testimony credible and adequately supported by facts and data that are contained both in his appraisal report and detailed in the trial record. Therefore, the court concludes that the subject property's actual rents, as of the October 1, 2020, October 1, 2021, October 1, 2022, and October 1, 2023 valuation dates, are prima facie evidence of economic or market rent, and thus, its fair rental value for purposes of the income capitalization method.

  b.   Potential Gross Income

"Potential gross income is the total income attributable to a real property at 100% occupancy before operating expenses are deducted." The Appraisal Institute, The Appraisal of Real Estate, 482 (11th ed. 1996) (emphasis added). Thus, the "actual rent roll" of a property on the "critical assessing date" is fundamental to determining the potential gross income and correspondingly, the true or market value of a property. Glen Wall Assocs., 99 N.J. at 274.

As keenly observed by Judge Small, our Supreme Court relied on a body of New Jersey legal authority in Parkway Village that "used actual rent rolls to conclude potential gross income


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



and then subtracted a market vacancy and rent loss allowance." Harclay House v. East Orange City, 18 N.J. Tax 564, 569 (Tax 2000). As detailed by the court in Harclay House, to calculate a property's potential gross income, the October 1st pre-tax year rent roll should be multiplied by twelve months. Ibid. Next, the "effective gross income [is determined] by subtracting a vacancy and rent loss allowance from [the] adjusted scheduled rent." Ibid. (citing The Appraisal of Real Estate, 482-490 (11th ed)).

Here, the evidence and testimony adduced during trial revealed a flaw in the expert's calculation of potential gross income. Despite possessing the "critical assessing date" rent rolls, as of October 1st of the pre-tax year, the expert did not calculate the subject property's potential gross income by annualizing the rental income reported on the subject property's rent rolls. Rather, the expert adopted Madison Bulldog's reported gross operating income, as its potential gross income for each tax year.

A property's reported gross operating income provides meaningful data that can be used by a valuation expert to gauge the accuracy of his or her concluded vacancy and collection loss factor and effective gross income. However, it is inappropriate to adopt a property's reported gross income as a substitute for potential gross income without confirming that it accurately represents 100% occupancy of a building.[6] If the property's reported gross operating income materially deviates from the annualized October 1st pre-tax year rent roll, the gross operating income does not accurately represent 100% occupancy or its potential gross income and likely includes the

---

[6] This can most easily be accomplished by comparing the annualized rent roll, as of October 1st of the pre-tax year (the October 1st pre-tax year rent roll multiplied by twelve), with the reported gross operating income for the tax year.


Interpreter

ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE


property's actual vacancy and/or collection losses.[7]

Here, the expert improperly adopted and applied the subject property's gross operating income as its potential gross income without verifying that it represented 100% occupancy. The court's review of the subject property's rent rolls disclosed material discrepancies between the subject property's annualized October 1st pre-tax year rent roll potential gross income and its reported gross operating income during each tax year. For example, the October 1, 2020 rent roll (for the 2021 tax year) revealed monthly rental income of $20,707, which annualized at 100% occupancy equals a potential gross income of $248,484 ($20,707 x 12 months). However, according to the expert, the subject property's reported gross operating income for the 2021 tax year was $239,600, a difference of $8,884 or approximately 3.6%. Thus, the subject property's reported gross operating income of $239,600 does not represent 100% occupancy, but rather likely includes vacancies and/or collection losses from actual operations during the 2021 year.

Although a 3.6% discrepancy between the subject property's annualized October 1st pre-tax year rent roll and its reported gross operating income may seem insignificant, the problem is then compounded by the expert by also deducting a market 5% allowance for vacancy or collection losses. In sum, by adopting the subject property's reported gross operating income (which includes Madison Bulldog's approximate 3.6% vacancy and collection losses), as its potential gross income, and then applying a market vacancy and collection loss factor, the expert duplicated the deduction for the vacancy and collection loss factor and underreported the subject property's net operating income.

---

[7] It is also possible that a property's reported gross operating income is less than the annualized rent roll because leases are being renewed during the tax year at lower rental rates. However, in the instant matters, the court's review of the rent rolls and Rent Roll Detail statements disclose that the subject property's year-over-year rents for the same apartments increased each year.






The following chart reconciles the subject property's October 1st pre-tax year rent rolls with the reported gross income reported by Madison Bulldog on its operating statements:

|  | 10/1/2020 | 10/1/2021 | 10/1/2022[8] | 10/1/2023 |
|---|---|---|---|---|
| Monthly rent roll | $20,707 | $20,762 | $21,808 | $23,930 |
| PGI based on annualized rent roll (rent roll x 12) | $248,484 | $249,144 | $261,696 | $287,160 |
| Expert's PGI based on reported gross operating income | $239,600 | $243,800 | $248,664 | $249,150 |
| Difference | $8,884 | $5,344 | $13,032 | $38,010 |

Accordingly, for the above stated reasons, the court rejects the expert's reported potential gross income for the subject property as of the October 1, 2020, October 1, 2021, October 1, 2022, and October 1, 2023 valuation dates. Instead, the court will compute the subject property's potential gross income by annualizing the subject property's October 1st pre-tax year rent roll. Therefore, the court finds that the subject property's potential gross income was: (i) $248,484, as of October 1, 2020; (ii) $249,144, as of October 1, 2021; (iii) $261,696, as of October 1, 2022; and (iv) $287,160, as of October 1, 2023.

      c.    Vacancy and Collection Loss

Vacancy and collection losses are "usually estimated as a percentage of potential gross income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute,

---

[8] The October 1, 2022 rent roll and December 31, 2022 Rent Roll Detail report reflects a rent of $0.00 for Unit 1-2E, a two-bedroom apartment. The December 31, 2023 Rent Roll Detail report reflects that Unit 1-2E became occupied on February 1, 2023, at a monthly rent of $1,373. Thus, in calculating the October 1, 2022 rent roll and the subject property's potential gross income based on the annualized rent roll, the court attributed a market rent of $1,373 to Unit 1-2E.






The Appraisal of Real Estate 478 (14th ed. 2013).

According to the expert, the subject property has a "waiting list for those wishing to move into the building," several tenants have occupied their apartments since 1999 when it was converted into an apartment building, and it experiences "very few vacancies."

Thus, to arrive at his vacancy and collection loss factor, the expert reviewed the subject property's actual occupancy rates, as well as vacancy data published by the Institute of Real Estate Management - IREM Northern NJ Apartments - New Jersey Northern - Low Rise Over 24 Units and IREM United States Apartments - Low Rise 12-24 Units. After reviewing that information, the expert opined that a vacancy and collection loss factor of five (5%) percent should be applied to the subject property's reconstructed potential gross income.

The court finds the expert's vacancy and collection loss factor is adequately supported in the trial record with evidence derived from the subject property and other market-based data. Therefore, the court will apply a vacancy and collection loss factor of five (5%) percent to the subject property's reconstructed potential gross income for the 2021, 2022, 2023, and 2024 tax years.

### d. Operating Expenses

The next step in the income capitalization approach is determination of the appropriate stabilized operating expenses. Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management." The Appraisal of Real Estate, at 479.

When the actual operating expenses of a well-managed apartment building are 'within normal operating limits,' they should be accepted and deemed representative of the marketplace. Parkway Vill. Apartments Co., 8 N.J. Tax at 441-42. Conversely, when the evidence discloses






that a property's economic rents are market derived, but the actual expenses are outside of acceptable norms, an adjustment must be fashioned to fit the "well-managed" standard. Equitable Life Assur. Soc'y of U.S. v. Twp. of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996). That is not to say that every operating expense must be accepted, adjusted, or stabilized in its entirety. An appraiser may elect to accept those operating expenses that are reasonable and typical of industry norms, and reject those that are irregular, uncharacteristic, and anomalous. The use of "both actual and stabilized expenses is acceptable appraisal practice." Maple Court Associates Ltd. v. Ridgefield Park Twp., 7 N.J. Tax 135, 153 (Tax 1984); See also Rudd v. Cranford Twp., 4 N.J. Tax 236, 244 (Tax. 1982); Skytop Gardens Inc. v. Sayreville Bor., 3 N.J. Tax 187, 194-96 (Tax 1981).

Here, the expert offered testimony that he reviewed the subject property's operating expenses, reviewed historic expense data for multi-family apartment buildings in New Jersey, conferred with market participants, and analyzed the following operating expense data compiled and published by the Institute of Real Estate Management: (i) 2019 Northern NJ Apartments - New Jersey Northern – Low Rise Over 24 Units; (ii) 2019 United States Apartments – Low Rise 12-24 Units; and (iii) a benchmark summary of operating expenses for three multi-family apartment buildings located in Jersey City, New York City, and Philadelphia. According to the expert, the IREM reports disclose that in the New Jersey Northern marketplace the average operating expenses for a Low Rise Over 24 Unit apartment building range from 28.10% to 35.30% of potential gross income, with an average of 32%.

Ultimately, the expert concluded that: (i) a 5% management expense was reasonable, based on his discussions with two property management firms; (ii) a 5% administration expense was reasonable (payroll, payroll taxes, office expenses, advertising and professional fees); (iii) a 11%






utility expense was reasonable (accepting the subject property's actual utility expense); (iv) repairs and maintenance expenses should be stabilized at 9%; (v) insurance expenses should be stabilized at 6% (accepting the subject property's actual insurance expense); (vi) a miscellaneous expense of 1% is reasonable; and (vii) a 3% replacement reserve for apartment unit appliances and structural items is reasonable. In sum, the expert stabilized the subject property's operating expenses at 40% of its potential gross income.

Based on the testimony elicited during trial and the court's review of the IREM reports, the court finds the expert's stabilized operating expenses to be reasonable and supported by the published data. Accordingly, the court accepts the expert's conclusion and finds that the following stabilized operating expenses should be applied to the subject property's potential gross income: (i) a 5% management expense; (ii) a 5% administration expense; (iii) a 11% utility expense; (iv) a 9% repair and maintenance expense; (v) a 6% insurance expense; (vi) a 1% miscellaneous expense; and (vii) a 3% replacement reserve.

e.    <u>Capitalization</u>

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." <u>The Appraisal of Real Estate</u>, at 491; <u>Prudential Ins. Co. of Am. v. Parsippany-Troy Hills Twp.</u>, 16 N.J. Tax 58, 60 (Tax 1995), <u>aff'd</u>, 16 N.J. Tax 148 (App. Div. 1996); <u>Hull Junction Holding Corp.</u>, 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, in deriving his capitalization rates, the expert employed the band of investment






technique and reviewed published investor survey data.[9]  The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.'  The technique includes both a mortgage and an equity component."  Hull Junction Holding Corp., 16 N.J. Tax at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)).

To perform the band of investment technique and derive his mortgage interest rates, loan-to-value ratios, loan amortization terms, and equity dividend rates, the expert reviewed and analyzed the following capitalization rate investor survey data: (i) Price Waterhouse Coopers Real Estate Investor Survey ("PwC") for the National Apartment Market for the 3rd Quarter 2020; (ii) American Council of Life Insurance ("ACLI") published investment bulletin tables for Apartments – Less than $2 million, for the 3rd Quarters 2020-2023; and (iii) ACLI published investment bulletin tables for Apartments – $2 million to $4.99 million, for the 3rd Quarters 2020-2023.

The following chart summarizes the expert's band of investment calculations including his concluded mortgage interest rates, loan-to-value ratios, loan amortization terms, equity dividend rates, and base capitalization rate:

|  | 10/1/2020 | 10/1/2021 | 10/1/2022 | 10/1/2023 |
|---|---|---|---|---|
| Interest rate | 4.5% | 4.5% | 5% | 6.5% |
| Loan-to-value ratio | 70% | 70% | 70% | 70% |
| Amortization term | 25 years | 25 years | 25 years | 25 years |
| Equity dividend rate | 5% | 7% | 5% | 4.5% |
| Base capitalization rate | 6.17% | 6.77% | 6.43% | 7.02% |

---

[9] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance."  Hull Junction Holding Corp., 16 N.J. Tax at 82-83.  In addition, "[r]elevant data is also collected and published by . . . [PwC] Real Estate Investor Survey."  Id. at 83.  By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers."  Ibid.






At the outset, the court emphasizes that the 25-year loan amortization term and 70% loan-to-value ratio employed by the expert for this apartment building under the band of investment technique are both credible and reasonable.  Therefore, the court accepts the expert's proffered 25-year loan amortization term and 70% loan-to-value ratio as of each valuation date at issue.

The court's review and analysis of the ACLI data reveals that, as of the October 1, 2020 valuation date, the two ACLI Bulletins relied on by the expert reported interest rates of 3.54% to 3.74% (notably, the average ACLI interest rate for all apartment subcategories was 3.09%), loan-to-value ratios of 46.68% to 51.41%, and capitalization rates of 5.30% to 5.31%.  Moreover, the court's review of the PwC data revealed capitalization rates in the 3rd Quarter 2020 were between 3.55% to 8%, with an average of 5.22%.

The court's review and analysis of the ACLI data reveals that, as of the October 1, 2021 valuation date, the two ACLI Bulletins relied on by the expert reported interest rates of 3.29% to 3.6% (notably, the average ACLI interest rate for all apartment subcategories was 2.83%), loan-to-value ratios of 49.21% to 62.51%, and capitalization rates of 6.17% to 6.5%.  Moreover, the court's review of the PwC data revealed capitalization rates in the 3rd Quarter 2021 were between 3% to 7%, with an average of 4.59%.

The court's review and analysis of the ACLI data reveals that, as of the October 1, 2022 valuation date, the two ACLI Bulletins relied on by the expert reported interest rates of 4.90% to 4.92% (notably, the average ACLI interest rate for all apartment subcategories was 4.77%), loan-to-value ratios of 47.26% to 62.54%, and capitalization rates of 5.31% to 6.45%.  Moreover, the court's review of the PwC data revealed capitalization rates in the 3rd Quarter 2022 were between 4.75% to 8%, with an average of 4.75%.

Finally, the court's review and analysis of the ACLI data reveals that, as of the October 1,






2023 valuation date, the two ACLI Bulletins relied on by the expert reported interest rates of 6.24% to 6.4% (notably, the average ACLI interest rate for all apartment subcategories was 5.91%), loan-to-value ratios of 37.07% to 61.95%, and capitalization rates of 5.10% to 6.83%. Moreover, the court's review of the PwC data revealed capitalization rates in the 3rd Quarter 2023 from 3.75% to 8%, with an average of 5.28%.

Accordingly, based on the court's review of the ACLI data, the PwC capitalization rate information, and consideration of the expert's testimony about the subject property and the subject property's market, the court finds that: (i) as of the October 1, 2020 valuation date, a 3.75% interest rate is more credible, and the expert's proffered 5% equity dividend rate is credible; (ii) as of the October 1, 2021 valuation date, a 3.50% interest rate is more credible, and a 5% equity dividend rate is more credible; (iii) as of the October 1, 2022 valuation date, a 4.875% interest rate is more credible, and the expert's proffered 5% equity dividend rate is credible; and (iv) as of the October 1, 2023 valuation date, a 6% interest rate is more credible, and the expert's proffered 4.5% equity dividend rate is credible.

Therefore, the court concludes that: (i) as of the October 1, 2020 valuation date, the base capitalization rate should be 5.82%[10]; (ii) as of the October 1, 2021 valuation date, the base capitalization rate should be 5.71%[11]; (iii) as of the October 1, 2022 valuation date, the base capitalization rate should be 6.35%[12]; and (iv) as of the October 1, 2023 valuation date, the base capitalization rate should be 6.76%.[13]

Accordingly, the reconstructed operating statements and capitalization rates for the 2021,

---

[10] 6.17% constant x .70 = 4.319% and 5% x .30 = 1.5% (4.319% + 1.5% = 5.82% rounded).
[11] 6.007% constant x .70 = 4.2049% and 5% x .30 = 1.5% (4.2049 % + 1.5% = 5.71% rounded).
[12] 6.928% constant x .70 = 4.8496% and 5% x .30 = 1.5% (4.8496% + 1.5% = 6.35% rounded%).
[13] 7.732% constant x .70 = 5.4124% and 4.5% x .30 = 1.35% (5.4124% + 1.35% = 6.76% rounded).






2022, 2023, and 2024 tax years are set forth below:

**2021 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments: | POTENTIAL GROSS INCOME | | $248,484 |
| Less: | Vacancy & Collection Loss | @ 5% | ($ 12,424) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $236,060 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of PGI | $12,424 | |
| Administration | @ 5% of PGI | $12,424 | |
| Miscellaneous | @ 1% of PGI | $ 2,485 | |
| Insurance | @ 6% of PGI | $14,909 | |
| Utilities | @ 11% of PGI | $27,333 | |
| Repairs/Maintenance | @ 9% of PGI | $22,364 | |
| Replacement Reserves | @ 3% of PGI | $ 7,455 | |
| TOTAL: EXPENSES | | ($99,394) | |

| | |
|---|---|
| NET OPERATING INCOME | $136,666 |

| | |
|---|---|
| Base Capitalization Rate | 5.82% |
| Effective Tax Rate | 3.42%[14] |
| Loaded Capitalization Rate | 9.24% |

| | |
|---|---|
| MARKET VALUE | $1,479,069 |

**2022 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments: | POTENTIAL GROSS INCOME | | $249,144 |
| Less: | Vacancy & Collection Loss | @ 5% | ($ 12,457) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $236,687 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of PGI | $12,457 | |
| Administration | @ 5% of PGI | $12,457 | |
| Miscellaneous | @ 1% of PGI | $ 2,491 | |
| Insurance | @ 6% of PGI | $14,949 | |
| Utilities | @ 11% of PGI | $27,406 | |
| Repairs/Maintenance | @ 9% of PGI | $22,423 | |
| Replacement Reserves | @ 3% of PGI | $ 7,474 | |
| TOTAL: EXPENSES | | ($99,657) | |

| | |
|---|---|
| NET OPERATING INCOME | $137,030 |

| | |
|---|---|
| Base Capitalization Rate | 5.71% |
| Effective Tax Rate | 3.15% |
| Loaded Capitalization Rate | 8.86% |

| | |
|---|---|
| MARKET VALUE | $1,546,614 |

---

[14] During trial, Paterson's counsel stipulated to the effective tax rates promulgated by the expert.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



**2023 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments: | POTENTIAL GROSS INCOME | | $261,696 |
| Less: | Vacancy & Collection Loss | @ 5% | ($ 13,085) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $248,611 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of PGI | $ 13,085 | |
| Administration | @ 5% of PGI | $ 13,085 | |
| Miscellaneous | @ 1% of PGI | $ 2,617 | |
| Insurance | @ 6% of PGI | $ 15,702 | |
| Utilities | @ 11% of PGI | $ 28,787 | |
| Repairs/Maintenance | @ 9% of PGI | $ 23,553 | |
| Replacement Reserves | @ 3% of PGI | $ 7,851 | |
| TOTAL: EXPENSES | | ($104,680) | |

NET OPERATING INCOME                                         $143,931

| | |
|---|---|
| Base Capitalization Rate | 6.35% |
| Effective Tax Rate | 2.91% |
| Loaded Capitalization Rate | 9.26% |

MARKET VALUE                                                 $1,554,330

**2024 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments: | POTENTIAL GROSS INCOME | | $287,160 |
| Less: | Vacancy & Collection Loss | @ 5% | ($ 14,358) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $272,802 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of PGI | $ 14,358 | |
| Administration | @ 5% of PGI | $ 14,358 | |
| Miscellaneous | @ 1% of PGI | $ 2,872 | |
| Insurance | @ 6% of PGI | $ 17,230 | |
| Utilities | @ 11% of PGI | $ 31,588 | |
| Repairs/Maintenance | @ 9% of PGI | $ 25,844 | |
| Replacement Reserves | @ 3% of PGI | $ 8,615 | |
| TOTAL: EXPENSES | | ($114,865) | |

NET OPERATING INCOME                                         $157,937

| | |
|---|---|
| Base Capitalization Rate | 6.76% |
| Effective Tax Rate | 2.61% |
| Loaded Capitalization Rate | 9.37% |

MARKET VALUE                                                 $1,685,560

Therefore, the court finds the true or fair market value of the subject property, under the

income-capitalization approach, to be: (i) $1,479,100, as of the October 1, 2020 valuation date; (ii)






$1,546,600, as of the October 1, 2021 valuation date; (iii) $1,554,300, as of the October 1, 2022

valuation date; and (iv) $1,685,600, as of the October 1, 2023 valuation date.

>        f.        Corrected Local Property Tax Assessment

Having reached conclusions of the subject property's true or fair market value, the court

will turn its attention to determining the subject property's correct tax assessments for the 2021,

2022, 2023, and 2024 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is

satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed

valuation of the subject property to its true value exceeds the upper limit or falls below the lower

limit of the common level range, it shall enter judgment revising the taxable value of the property

by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This

process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2021 tax year, the ratio of assessed value, $2,985,900, to true market value,

$1,479,100, yields a ratio of 201.87% ($2,985,900/$1,479,100 = 201.87%), which exceeds

Paterson's upper limit (87.69%) of the Chapter 123 common level range. Consequently, the

subject property's tax assessment calculation for the 2021 tax year is:

$$\$1,479,100 \ \times \ .7625 = \qquad \$1,128,000 \ [ROUNDED]$$

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2021 will be entered as follows:

| Land | $ 403,300 |
|------|-----------|
| Improvement | $ 724,700 |
| Total | $1,128,000 |

For the 2022 tax year, the ratio of assessed value, $2,985,900, to true market value,

$1,546,600, yields a ratio of 193.06% ($2,985,900/$1,546,600 = 193.06%), which exceeds






Paterson's upper limit (78.18%) of the Chapter 123 common level range. Consequently, the

subject property's tax assessment calculation for the 2022 tax year is:

$1,546,600 x .6798 = $1,051,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2022 will be entered as follows:

| | |
|---|---|
| Land | $ 403,300 |
| Improvement | $ 647,700 |
| Total | $1,051,000 |

For the 2023 tax year, the ratio of assessed value, $2,985,900, to true market value,

$1,554,300, yields a ratio of 192.11% ($2,985,900/$1,554,300 = 192.11%), which exceeds

Paterson's upper limit (68.25%) of the Chapter 123 common level range. Consequently, the

subject property's tax assessment calculation for the 2023 tax year is:

$1,554,300 x .5935 = $922,500 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2023 will be entered as follows:

| | |
|---|---|
| Land | $403,300 |
| Improvement | $519,200 |
| Total | $922,500 |

For the 2024 tax year, the ratio of assessed value, $2,985,900, to true market value,

$1,685,600, yields a ratio of 177.14% ($2,985,900/$1,685,600 = 177.14%), which exceeds

Paterson's upper limit (58.88%) of the Chapter 123 common level range. Consequently, the

subject property's tax assessment calculation for the 2024 tax year is:

$1,685,600 x .5120 = $863,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2024 will be entered as follows:






Interpreter

ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE

| | |
|---|---|
| Land | $403,300 |
| Improvement | $459,700 |
| Total | $863,000 |

Accordingly, contemporaneous herewith the court shall enter judgments reducing the subject property's 2021, 2022, 2023, and 2024 local property tax assessments as set forth above.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




